# DIRKS *v.* SECURITIES AND EXCHANGE COMMISSION

No. 82–276.  Argued March 21, 1983—Decided July 1, 1983

*David Bonderman* argued the cause for petitioner. With him on the briefs were *Lawrence A. Schneider* and *Eric Summergrad.*

*Paul Gonson* argued the cause for respondent. With him on the brief were *Daniel L. Goelzer, Jacob H. Stillman,* and *Whitney Adams.**

JUSTICE POWELL delivered the opinion of the Court.

Petitioner Raymond Dirks received material nonpublic information from "insiders" of a corporation with which he had no connection. He disclosed this information to investors who relied on it in trading in the shares of the corporation. The question is whether Dirks violated the antifraud provisions of the federal securities laws by this disclosure.

## I

In 1973, Dirks was an officer of a New York broker-dealer firm who specialized in providing investment analysis of insurance company securities to institutional investors.[1] On

---

*Solicitor General Lee, Assistant Attorney General Jensen, Stephen M. Shapiro, Deputy Assistant Attorney General Olsen, David A. Strauss,* and *Geoffrey S. Stewart* filed a brief for the United States as *amicus curiae* urging reversal.

*Edward H. Fleischman, Richard E. Nathan, Martin P. Unger,* and *William J. Fitzpatrick* filed a brief for the Securities Industry Association as *amicus curiae.*

[1] The facts stated here are taken from more detailed statements set forth by the Administrative Law Judge, App. 176–180, 225–247; the opinion of the Securities and Exchange Commission, 21 S. E. C. Docket 1401, 1402–

March 6, Dirks received information from Ronald Secrist, a former officer of Equity Funding of America. Secrist alleged that the assets of Equity Funding, a diversified corporation primarily engaged in selling life insurance and mutual funds, were vastly overstated as the result of fraudulent corporate practices. Secrist also stated that various regulatory agencies had failed to act on similar charges made by Equity Funding employees. He urged Dirks to verify the fraud and disclose it publicly.

Dirks decided to investigate the allegations. He visited Equity Funding's headquarters in Los Angeles and interviewed several officers and employees of the corporation. The senior management denied any wrongdoing, but certain corporation employees corroborated the charges of fraud. Neither Dirks nor his firm owned or traded any Equity Funding stock, but throughout his investigation he openly discussed the information he had obtained with a number of clients and investors. Some of these persons sold their holdings of Equity Funding securities, including five investment advisers who liquidated holdings of more than $16 million.[2]

While Dirks was in Los Angeles, he was in touch regularly with William Blundell, the Wall Street Journal's Los Angeles bureau chief. Dirks urged Blundell to write a story on the fraud allegations. Blundell did not believe, however, that such a massive fraud could go undetected and declined to

---

1406 (1981); and the opinion of Judge Wright in the Court of Appeals, 220 U. S. App. D. C. 309, 314–318, 681 F. 2d 824, 829–833 (1982).

[2] Dirks received from his firm a salary plus a commission for securities transactions above a certain amount that his clients directed through his firm. See 21 S. E. C. Docket, at 1402, n. 3. But "[i]t is not clear how many of those with whom Dirks spoke promised to direct some brokerage business through [Dirks' firm] to compensate Dirks, or how many actually did so." 220 U. S. App. D. C., at 316, 681 F. 2d, at 831. The Boston Company Institutional Investors, Inc., promised Dirks about $25,000 in commissions, but it is unclear whether Boston actually generated any brokerage business for his firm. See App. 199, 204–205; 21 S. E. C. Docket, at 1404, n. 10; 220 U. S. App. D. C., at 316, n. 5, 681 F. 2d, at 831, n. 5.

write the story. He feared that publishing such damaging hearsay might be libelous.

During the 2-week period in which Dirks pursued his investigation and spread word of Secrist's charges, the price of Equity Funding stock fell from $26 per share to less than $15 per share. This led the New York Stock Exchange to halt trading on March 27. Shortly thereafter California insurance authorities impounded Equity Funding's records and uncovered evidence of the fraud. Only then did the Securities and Exchange Commission (SEC) file a complaint against Equity Funding[3] and only then, on April 2, did the Wall Street Journal publish a front-page story based largely on information assembled by Dirks. Equity Funding immediately went into receivership.[4]

The SEC began an investigation into Dirks' role in the exposure of the fraud. After a hearing by an Administrative Law Judge, the SEC found that Dirks had aided and abetted violations of § 17(a) of the Securities Act of 1933, 48 Stat. 84, as amended, 15 U. S. C. § 77q(a),[5] § 10(b) of the Securities

---

[3] As early as 1971, the SEC had received allegations of fraudulent accounting practices at Equity Funding. Moreover, on March 9, 1973, an official of the California Insurance Department informed the SEC's regional office in Los Angeles of Secrist's charges of fraud. Dirks himself voluntarily presented his information at the SEC's regional office beginning on March 27.

[4] A federal grand jury in Los Angeles subsequently returned a 105-count indictment against 22 persons, including many of Equity Funding's officers and directors. All defendants were found guilty of one or more counts, either by a plea of guilty or a conviction after trial. See Brief for Petitioner 15; App. 149–153.

[5] Section 17(a), as set forth in 15 U. S. C. § 77q(a), provides:

"It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—

"(1) to employ any device, scheme, or artifice to defraud, or

"(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to

Exchange Act of 1934, 48 Stat. 891, 15 U. S. C. § 78j(b),[6] and SEC Rule 10b–5, 17 CFR § 240.10b–5 (1983),[7] by repeating the allegations of fraud to members of the investment community who later sold their Equity Funding stock. The SEC concluded: "Where 'tippees'—regardless of their motivation or occupation—come into possession of material 'corporate information that they know is confidential and know or should know came from a corporate insider,' they must either publicly disclose that information or refrain from trading." 21 S. E. C. Docket 1401, 1407 (1981) (footnote omitted) (quoting *Chiarella* v. *United States*, 445 U. S. 222, 230, n. 12 (1980)). Recognizing, however, that Dirks "played an important role in bringing [Equity Funding's] massive fraud

---

make the statements made, in the light of the circumstances under which they were made, not misleading, or

"(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser."

[6] Section 10(b) provides:

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

.                .                .                .                .

"(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

[7] Rule 10b–5 provides:

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

"(a) To employ any device, scheme, or artifice to defraud,

"(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

"(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."

to light," 21 S. E. C. Docket, at 1412,[8] the SEC only censured him.[9]

Dirks sought review in the Court of Appeals for the District of Columbia Circuit. The court entered judgment against Dirks "for the reasons stated by the Commission in its opinion." App. to Pet. for Cert. C–2. Judge Wright, a member of the panel, subsequently issued an opinion. Judge Robb concurred in the result and Judge Tamm dissented; neither filed a separate opinion. Judge Wright believed that "the obligations of corporate fiduciaries pass to all those to whom they disclose their information before it has been disseminated to the public at large." 220 U. S. App. D. C. 309, 324, 681 F. 2d 824, 839 (1982). Alternatively, Judge Wright concluded that, as an employee of a broker-dealer, Dirks had violated "obligations to the SEC and to the public completely independent of any obligations he acquired" as a result of receiving the information. *Id.*, at 325, 681 F. 2d, at 840.

In view of the importance to the SEC and to the securities industry of the question presented by this case, we granted a writ of certiorari. 459 U. S. 1014 (1982). We now reverse.

---

[8] JUSTICE BLACKMUN's dissenting opinion minimizes the role Dirks played in making public the Equity Funding fraud. See *post,* at 670 and 677, n. 15. The dissent would rewrite the history of Dirks' extensive investigative efforts. See, *e. g.,* 21 S. E. C. Docket, at 1412 ("It is clear that Dirks played an important role in bringing [Equity Funding's] massive fraud to light, and it is also true that he reported the fraud allegation to [Equity Funding's] auditors and sought to have the information published in the *Wall Street Journal*"); 220 U. S. App. D. C., at 314, 681 F. 2d, at 829 (Wright, J.) ("Largely thanks to Dirks one of the most infamous frauds in recent memory was uncovered and exposed, while the record shows that the SEC repeatedly missed opportunities to investigate Equity Funding").

[9] Section 15 of the Securities Exchange Act, 15 U. S. C. § 78o(b)(4)(E), provides that the SEC may impose certain sanctions, including censure, on any person associated with a registered broker-dealer who has "willfully aided [or] abetted" any violation of the federal securities laws. See 15 U. S. C. § 78ff(a) (1976 ed., Supp. V) (providing criminal penalties).

## II

In the seminal case of *In re Cady, Roberts & Co.*, 40 S. E. C. 907 (1961), the SEC recognized that the common law in some jurisdictions imposes on "corporate 'insiders,' particularly officers, directors, or controlling stockholders" an "affirmative duty of disclosure . . . when dealing in securities." *Id.*, at 911, and n. 13.[10]  The SEC found that not only did breach of this common-law duty also establish the elements of a Rule 10b–5 violation,[11] but that individuals other than corporate insiders could be obligated either to disclose material nonpublic information[12] before trading or to abstain from trading altogether. *Id.*, at 912.  In *Chiarella*, we accepted the two elements set out in *Cady, Roberts* for establishing a Rule 10b–5 violation: "(i) the existence of a relationship affording access to inside information intended to be available only for a corporate purpose, and (ii) the unfairness of allowing a corporate insider to take advantage of that in-

---

[10] The duty that insiders owe to the corporation's shareholders not to trade on inside information differs from the common-law duty that officers and directors also have to the corporation itself not to mismanage corporate assets, of which confidential information is one.  See 3 W. Fletcher, Cyclopedia of the Law of Private Corporations §§ 848, 900 (rev. ed. 1975 and Supp. 1982); 3A *id.*, §§ 1168.1, 1168.2 (rev. ed. 1975).  In holding that breaches of this duty to shareholders violated the Securities Exchange Act, the *Cady, Roberts* Commission recognized, and we agree, that "[a] significant purpose of the Exchange Act was to eliminate the idea that use of inside information for personal advantage was a normal emolument of corporate office."  See 40 S. E. C., at 912, n. 15.

[11] Rule 10b–5 is generally the most inclusive of the three provisions on which the SEC rested its decision in this case, and we will refer to it when we note the statutory basis for the SEC's inside-trading rules.

[12] The SEC views the disclosure duty as requiring more than disclosure to purchasers or sellers: "Proper and adequate disclosure of significant corporate developments can only be effected by a public release through the appropriate public media, designed to achieve a broad dissemination to the investing public generally and without favoring any special person or group." *In re Faberge, Inc.*, 45 S. E. C. 249, 256 (1973).

formation by trading without disclosure." 445 U. S., at 227. In examining whether Chiarella had an obligation to disclose or abstain, the Court found that there is no general duty to disclose before trading on material nonpublic information,[13] and held that "a duty to disclose under § 10(b) does not arise from the mere possession of nonpublic market information." *Id.*, at 235. Such a duty arises rather from the existence of a fiduciary relationship. See *id.*, at 227–235.

Not "all breaches of fiduciary duty in connection with a securities transaction," however, come within the ambit of Rule 10b–5. *Santa Fe Industries, Inc.* v. *Green*, 430 U. S. 462, 472 (1977). There must also be "manipulation or deception." *Id.*, at 473. In an inside-trading case this fraud derives from the "inherent unfairness involved where one takes advantage" of "information intended to be available only for a corporate purpose and not for the personal benefit of anyone." *In re Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 43 S. E. C. 933, 936 (1968). Thus, an insider will be liable under Rule 10b–5 for inside trading only where he fails to disclose material nonpublic information before trading on it and thus makes "secret profits." *Cady, Roberts, supra,* at 916, n. 31.

### III

We were explicit in *Chiarella* in saying that there can be no duty to disclose where the person who has traded on inside information "was not [the corporation's] agent, . . . was not a fiduciary, [or] was not a person in whom the sellers [of the securities] had placed their trust and confidence." 445 U. S., at 232. Not to require such a fiduciary relationship, we recognized, would "depar[t] radically from the established doctrine that duty arises from a specific relationship between

[13] See 445 U. S., at 233; *id.*, at 237 (STEVENS, J., concurring); *id.*, at 238–239 (BRENNAN, J., concurring in judgment); *id.*, at 239–240 (BURGER, C. J., dissenting). Cf. *id.*, at 252, n. 2 (BLACKMUN, J., dissenting) (recognizing that there is no obligation to disclose material nonpublic information obtained through the exercise of "diligence or acumen" and "honest means," as opposed to "stealth").

two parties" and would amount to "recognizing a general duty between all participants in market transactions to forgo actions based on material, nonpublic information." *Id.*, at 232, 233. This requirement of a specific relationship between the shareholders and the individual trading on inside information has created analytical difficulties for the SEC and courts in policing tippees who trade on inside information. Unlike insiders who have independent fiduciary duties to both the corporation and its shareholders, the typical tippee has no such relationships.[14] In view of this absence, it has been unclear how a tippee acquires the *Cady, Roberts* duty to refrain from trading on inside information.

## A

The SEC's position, as stated in its opinion in this case, is that a tippee "inherits" the *Cady, Roberts* obligation to shareholders whenever he receives inside information from an insider:

"In tipping potential traders, Dirks breached a duty which he had assumed as a result of knowingly receiving

---

[14] Under certain circumstances, such as where corporate information is revealed legitimately to an underwriter, accountant, lawyer, or consultant working for the corporation, these outsiders may become fiduciaries of the shareholders. The basis for recognizing this fiduciary duty is not simply that such persons acquired nonpublic corporate information, but rather that they have entered into a special confidential relationship in the conduct of the business of the enterprise and are given access to information solely for corporate purposes. See *SEC* v. *Monarch Fund*, 608 F. 2d 938, 942 (CA2 1979); *In re Investors Management Co.*, 44 S. E. C. 633, 645 (1971); *In re Van Alstyne, Noel & Co.*, 43 S. E. C. 1080, 1084–1085 (1969); *In re Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 43 S. E. C. 933, 937 (1968); *Cady, Roberts*, 40 S. E. C., at 912. When such a person breaches his fiduciary relationship, he may be treated more properly as a tipper than a tippee. See *Shapiro* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 495 F. 2d 228, 237 (CA2 1974) (investment banker had access to material information when working on a proposed public offering for the corporation). For such a duty to be imposed, however, the corporation must expect the outsider to keep the disclosed nonpublic information confidential, and the relationship at least must imply such a duty.

confidential information from [Equity Funding] insiders. Tippees such as Dirks who receive non-public, material information from insiders become 'subject to the same duty as [the] insiders.' *Shapiro* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.* [495 F. 2d 228, 237 (CA2 1974) (quoting *Ross* v. *Licht*, 263 F. Supp. 395, 410 (SDNY 1967))]. Such a tippee breaches the fiduciary duty which he assumes from the insider when the tippee knowingly transmits the information to someone who will probably trade on the basis thereof. . . . Presumably, Dirks' informants were entitled to disclose the [Equity Funding] fraud in order to bring it to light and its perpetrators to justice. However, Dirks—standing in their shoes—committed a breach of the fiduciary duty which he had assumed in dealing with them, when he passed the information on to traders." 21 S. E. C. Docket, at 1410, n. 42.

This view differs little from the view that we rejected as inconsistent with congressional intent in *Chiarella*. In that case, the Court of Appeals agreed with the SEC and affirmed Chiarella's conviction, holding that *"[a]nyone*—corporate insider or not—who regularly receives material nonpublic information may not use that information to trade in securities without incurring an affirmative duty to disclose." *United States* v. *Chiarella*, 588 F. 2d 1358, 1365 (CA2 1978) (emphasis in original). Here, the SEC maintains that anyone who knowingly receives nonpublic material information from an insider has a fiduciary duty to disclose before trading.[15]

---

[15] Apparently, the SEC believes this case differs from *Chiarella* in that Dirks' receipt of inside information from Secrist, an insider, carried Secrist's duties with it, while Chiarella received the information without the direct involvement of an insider and thus inherited no duty to disclose or abstain. The SEC fails to explain, however, why the receipt of nonpublic information from an insider automatically carries with it the fiduciary duty of the insider. As we emphasized in *Chiarella*, mere possession of nonpublic information does not give rise to a duty to disclose or abstain; only a specific relationship does that. And we do not believe that the mere

In effect, the SEC's theory of tippee liability in both cases appears rooted in the idea that the antifraud provisions require equal information among all traders. This conflicts with the principle set forth in *Chiarella* that only some persons, under some circumstances, will be barred from trading while in possession of material nonpublic information.[16] Judge Wright correctly read our opinion in *Chiarella* as repudiating any notion that all traders must enjoy equal information before trading: "[T]he 'information' theory is rejected. Because the disclose-or-refrain duty is extraordinary, it attaches only when a party has legal obligations other than a mere duty to comply with the general antifraud proscriptions in the federal securities laws." 220 U. S. App. D. C., at 322, 681 F. 2d, at 837. See *Chiarella*, 445 U. S., at 235, n. 20. We reaffirm today that "[a] duty [to disclose]

---

receipt of information from an insider creates such a special relationship between the tippee and the corporation's shareholders.

Apparently recognizing the weakness of its argument in light of *Chiarella*, the SEC attempts to distinguish that case factually as involving not "inside" information, but rather "market" information, *i. e.*, "information originating outside the company and usually about the supply and demand for the company's securities." Brief for Respondent 22. This Court drew no such distinction in *Chiarella* and, as THE CHIEF JUSTICE noted, "[i]t is clear that § 10(b) and Rule 10b-5 by their terms and by their history make no such distinction." 445 U. S., at 241, n. 1 (dissenting opinion). See ALI, Federal Securities Code § 1603, Comment (2)(j) (Prop. Off. Draft 1978).

[16] In *Chiarella*, we noted that formulation of an absolute equal information rule "should not be undertaken absent some explicit evidence of congressional intent." 445 U. S., at 233. Rather than adopting such a radical view of securities trading, Congress has expressly exempted many market professionals from the general statutory prohibition set forth in § 11(a)(1) of the Securities Exchange Act, 15 U. S. C. § 78k(a)(1), against members of a national securities exchange trading for their own account. See *id.*, at 233, n. 16. We observed in *Chiarella* that "[t]he exception is based upon Congress' recognition that [market professionals] contribute to a fair and orderly marketplace at the same time they exploit the informational advantage that comes from their possession of [nonpublic information]." *Ibid.*

658

arises from the relationship between parties . . . and not merely from one's ability to acquire information because of his position in the market." *Id.*, at 231–232, n. 14.

Imposing a duty to disclose or abstain solely because a person knowingly receives material nonpublic information from an insider and trades on it could have an inhibiting influence on the role of market analysts, which the SEC itself recognizes is necessary to the preservation of a healthy market.[17] It is commonplace for analysts to "ferret out and analyze information," 21 S. E. C. Docket, at 1406,[18] and this often is done by meeting with and questioning corporate officers and others who are insiders. And information that the analysts

---

[17] The SEC expressly recognized that "[t]he value to the entire market of [analysts'] efforts cannot be gainsaid; market efficiency in pricing is significantly enhanced by [their] initiatives to ferret out and analyze information, and thus the analyst's work redounds to the benefit of all investors." 21 S. E. C. Docket, at 1406. The SEC asserts that analysts remain free to obtain from management corporate information for purposes of "filling in the 'interstices in analysis'. . . ." Brief for Respondent 42 (quoting *Investors Management Co.*, 44 S. E. C., at 646). But this rule is inherently imprecise, and imprecision prevents parties from ordering their actions in accord with legal requirements. Unless the parties have some guidance as to where the line is between permissible and impermissible disclosures and uses, neither corporate insiders nor analysts can be sure when the line is crossed. Cf. *Adler* v. *Klawans*, 267 F. 2d 840, 845 (CA2 1959) (Burger, J., sitting by designation).

[18] On its facts, this case is the unusual one. Dirks is an analyst in a broker-dealer firm, and he did interview management in the course of his investigation. He uncovered, however, startling information that required no analysis or exercise of judgment as to its market relevance. Nonetheless, the principle at issue here extends beyond these facts. The SEC's rule—applicable without regard to any breach by an insider—could have serious ramifications on reporting by analysts of investment views. Despite the unusualness of Dirks' "find," the central role that he played in uncovering the fraud at Equity Funding, and that analysts in general can play in revealing information that corporations may have reason to withhold from the public, is an important one. Dirks' careful investigation brought to light a massive fraud at the corporation. And until the Equity Funding fraud was exposed, the information in the trading market was grossly inaccurate. But for Dirks' efforts, the fraud might well have gone undetected longer. See n. 8, *supra*.

obtain normally may be the basis for judgments as to the market worth of a corporation's securities. The analyst's judgment in this respect is made available in market letters or otherwise to clients of the firm. It is the nature of this type of information, and indeed of the markets themselves, that such information cannot be made simultaneously available to all of the corporation's stockholders or the public generally.

B

The conclusion that recipients of inside information do not invariably acquire a duty to disclose or abstain does not mean that such tippees always are free to trade on the information. The need for a ban on some tippee trading is clear. Not only are insiders forbidden by their fiduciary relationship from personally using undisclosed corporate information to their advantage, but they also may not give such information to an outsider for the same improper purpose of exploiting the information for their personal gain. See 15 U. S. C. § 78t(b) (making it unlawful to do indirectly "by means of any other person" any act made unlawful by the federal securities laws). Similarly, the transactions of those who knowingly participate with the fiduciary in such a breach are "as forbidden" as transactions "on behalf of the trustee himself." *Mosser* v. *Darrow*, 341 U. S. 267, 272 (1951). See *Jackson* v. *Smith*, 254 U. S. 586, 589 (1921); *Jackson* v. *Ludeling*, 21 Wall. 616, 631–632 (1874). As the Court explained in *Mosser*, a contrary rule "would open up opportunities for devious dealings in the name of others that the trustee could not conduct in his own." 341 U. S., at 271. See *SEC* v. *Texas Gulf Sulphur Co.*, 446 F. 2d 1301, 1308 (CA2), cert. denied, 404 U. S. 1005 (1971). Thus, the tippee's duty to disclose or abstain is derivative from that of the insider's duty. See Tr. of Oral Arg. 38. Cf. *Chiarella*, 445 U. S., at 246, n. 1 (BLACKMUN, J., dissenting). As we noted in *Chiarella*, "[t]he tippee's obligation has been viewed as arising from his role as a participant after the fact in the insider's breach of a fiduciary duty." *Id.*, at 230, n. 12.

Thus, some tippees must assume an insider's duty to the shareholders not because they receive inside information, but rather because it has been made available to them *improperly*.[19] And for Rule 10b–5 purposes, the insider's disclosure is improper only where it would violate his *Cady, Roberts* duty. Thus, a tippee assumes a fiduciary duty to the shareholders of a corporation not to trade on material nonpublic information only when the insider has breached his fiduciary duty to the shareholders by disclosing the information to the tippee and the tippee knows or should know that there has been a breach.[20] As Commissioner Smith perceptively ob-

[19] The SEC itself has recognized that tippee liability properly is imposed only in circumstances where the tippee knows, or has reason to know, that the insider has disclosed improperly inside corporate information. In *Investors Management Co.*, *supra*, the SEC stated that one element of tippee liability is that the tippee knew or had reason to know that the information "was non-public and had been obtained *improperly* by selective revelation or otherwise." 44 S. E. C., at 641 (emphasis added). Commissioner Smith read this test to mean that a tippee can be held liable only if he received information in breach of an insider's duty not to disclose it. *Id.*, at 650 (concurring in result).

[20] Professor Loss has linked tippee liability to the concept in the law of restitution that " '[w]here a fiduciary in violation of his duty to the beneficiary communicates confidential information to a third person, the third person, if he had notice of the violation of duty, holds upon a constructive trust for the beneficiary any profit which he makes through the use of such information.' " 3 L. Loss, Securities Regulation 1451 (2d ed. 1961) (quoting Restatement of Restitution § 201(2) (1937)). Other authorities likewise have expressed the view that tippee liability exists only where there has been a breach of trust by an insider of which the tippee had knowledge. See, *e. g., Ross* v. *Licht*, 263 F. Supp. 395, 410 (SDNY 1967); A. Jacobs, The Impact of Rule 10b–5, § 167, p. 7–4 (rev. ed. 1980) ("[T]he better view is that a tipper must know or have reason to know the information is non-public and was improperly obtained"); Fleischer, Mundheim, & Murphy, An Initial Inquiry Into the Responsibility to Disclose Market Information, 121 U. Pa. L. Rev. 798, 818, n. 76 (1973) ("The extension of rule 10b–5 restrictions to tippees of corporate insiders can best be justified on the theory that they are participating in the insider's breach of his fiduciary duty"). Cf. Restatement (Second) of Agency § 312, Comment *c* (1958) ("A person who, with notice that an agent is thereby violating his duty

served in *In re Investors Management Co.*, 44 S. E. C. 633 (1971): "[T]ippee responsibility must be related back to insider responsibility by a necessary finding that the tippee knew the information was given to him in breach of a duty by a person having a special relationship to the issuer not to disclose the information . . . ." *Id.*, at 651 (concurring in result). Tipping thus properly is viewed only as a means of indirectly violating the *Cady, Roberts* disclose-or-abstain rule.[21]

## C

In determining whether a tippee is under an obligation to disclose or abstain, it thus is necessary to determine whether the insider's "tip" constituted a breach of the insider's fiduciary duty. All disclosures of confidential corporate informa-

to his principal, receives confidential information from the agent, may be [deemed] . . . a constructive trustee").

[21] We do not suggest that knowingly trading on inside information is ever "socially desirable or even that it is devoid of moral considerations." Dooley, Enforcement of Insider Trading Restrictions, 66 Va. L. Rev. 1, 55 (1980). Nor do we imply an absence of responsibility to disclose promptly indications of illegal actions by a corporation to the proper authorities—typically the SEC and exchange authorities in cases involving securities. Depending on the circumstances, and even where permitted by law, one's trading on material nonpublic information is behavior that may fall below ethical standards of conduct. But in a statutory area of the law such as securities regulation, where legal principles of general application must be applied, there may be "significant distinctions between actual legal obligations and ethical ideals." SEC, Report of Special Study of Securities Markets, H. R. Doc. No. 95, 88th Cong., 1st Sess., pt. 1, pp. 237–238 (1963). The SEC recognizes this. At oral argument, the following exchange took place:

"QUESTION: So, it would not have satisfied his obligation under the law to go to the SEC first?

"[SEC's counsel]: That is correct. That an insider has to observe what has come to be known as the abstain or disclosure rule. Either the information has to be disclosed to the market if it is inside information . . . or the insider must abstain." Tr. of Oral Arg. 27.

Thus, it is clear that Rule 10b–5 does not impose any obligation simply to tell the SEC about the fraud before trading.

tion are not inconsistent with the duty insiders owe to shareholders. In contrast to the extraordinary facts of this case, the more typical situation in which there will be a question whether disclosure violates the insider's *Cady, Roberts* duty is when insiders disclose information to analysts. See n. 16, *supra.* In some situations, the insider will act consistently with his fiduciary duty to shareholders, and yet release of the information may affect the market. For example, it may not be clear—either to the corporate insider or to the recipient analyst—whether the information will be viewed as material nonpublic information. Corporate officials may mistakenly think the information already has been disclosed or that it is not material enough to affect the market. Whether disclosure is a breach of duty therefore depends in large part on the purpose of the disclosure. This standard was identified by the SEC itself in *Cady, Roberts:* a purpose of the securities laws was to eliminate "use of inside information for personal advantage." 40 S. E. C., at 912, n. 15. See n. 10, *supra.* Thus, the test is whether the insider personally will benefit, directly or indirectly, from his disclosure. Absent some personal gain, there has been no breach of duty to stockholders. And absent a breach by the insider, there is no derivative breach.[22] As Commissioner Smith stated in *Investors Management Co.:* "It is important in this type of

---

[22] An example of a case turning on the court's determination that the disclosure did not impose any fiduciary duties on the recipient of the inside information is *Walton* v. *Morgan Stanley & Co.*, 623 F. 2d 796 (CA2 1980). There, the defendant investment banking firm, representing one of its own corporate clients, investigated another corporation that was a possible target of a takeover bid by its client. In the course of negotiations the investment banking firm was given, on a confidential basis, unpublished material information. Subsequently, after the proposed takeover was abandoned, the firm was charged with relying on the information when it traded in the target corporation's stock. For purposes of the decision, it was assumed that the firm knew the information was confidential, but that it had been received in arm's-length negotiations. See *id.*, at 798. In the absence of any fiduciary relationship, the Court of Appeals found no basis for imposing tippee liability on the investment firm. See *id.*, at 799.

case to focus on policing insiders and what they do . . . rather than on policing information *per se* and its possession. . . ." 44 S. E. C., at 648 (concurring in result).

The SEC argues that, if inside-trading liability does not exist when the information is transmitted for a proper purpose but is used for trading, it would be a rare situation when the parties could not fabricate some ostensibly legitimate business justification for transmitting the information. We think the SEC is unduly concerned. In determining whether the insider's purpose in making a particular disclosure is fraudulent, the SEC and the courts are not required to read the parties' minds. Scienter in some cases is relevant in determining whether the tipper has violated his *Cady, Roberts* duty.[23] But to determine whether the disclosure itself "deceive[s], manipulate[s], or defraud[s]" shareholders, *Aaron* v. *SEC*, 446 U. S. 680, 686 (1980), the initial inquiry is whether there has been a breach of duty by the insider. This requires courts to focus on objective criteria, *i. e.*, whether the insider receives a direct or indirect personal benefit from the disclosure, such as a pecuniary gain or a reputational benefit that will translate into future earnings. Cf. 40 S. E. C., at 912, n. 15; Brudney, Insiders, Outsiders, and Informational Advantages Under the Federal Securities

---

[23] Scienter—"a mental state embracing intent to deceive, manipulate, or defraud," *Ernst & Ernst* v. *Hochfelder*, 425 U. S. 185, 193–194, n. 12 (1976)—is an independent element of a Rule 10b–5 violation. See *Aaron* v. *SEC*, 446 U. S. 680, 695 (1980). Contrary to the dissent's suggestion, see *post*, at 674, n. 10, motivation is not irrelevant to the issue of scienter. It is not enough that an insider's conduct results in harm to investors; rather, a violation may be found only where there is "intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities." *Ernst & Ernst* v. *Hochfelder*, *supra*, at 199. The issue in this case, however, is not whether Secrist or Dirks acted with scienter, but rather whether there was any deceptive or fraudulent conduct at all, *i. e.*, whether Secrist's disclosure constituted a breach of his fiduciary duty and thereby caused injury to shareholders. See n. 27, *infra*. Only if there was such a breach did Dirks, a tippee, acquire a fiduciary duty to disclose or abstain.

Laws, 93 Harv. L. Rev. 322, 348 (1979) ("The theory . . . is
that the insider, by giving the information out selectively,
is in effect selling the information to its recipient for cash,
reciprocal information, or other things of value for himself
. . ."). There are objective facts and circumstances that
often justify such an inference. For example, there may be
a relationship between the insider and the recipient that sug-
gests a *quid pro quo* from the latter, or an intention to benefit
the particular recipient. The elements of fiduciary duty and
exploitation of nonpublic information also exist when an in-
sider makes a gift of confidential information to a trading
relative or friend. The tip and trade resemble trading by
the insider himself followed by a gift of the profits to the
recipient.

Determining whether an insider personally benefits from a
particular disclosure, a question of fact, will not always be
easy for courts. But it is essential, we think, to have a guid-
ing principle for those whose daily activities must be limited
and instructed by the SEC's inside-trading rules, and we be-
lieve that there must be a breach of the insider's fiduciary
duty before the tippee inherits the duty to disclose or ab-
stain. In contrast, the rule adopted by the SEC in this case
would have no limiting principle.[24]

---

[24] Without legal limitations, market participants are forced to rely on the
reasonableness of the SEC's litigation strategy, but that can be hazardous,
as the facts of this case make plain. Following the SEC's filing of the
*Texas Gulf Sulphur* action, Commissioner (and later Chairman) Budge
spoke of the various implications of applying Rule 10b–5 in inside-trading
cases:

"Turning to the realm of possible defendants in the present and potential
civil actions, the Commission certainly does not contemplate suing every
person who may have come across inside information. In the Texas Gulf
action neither tippees nor persons in the vast rank and file of employees
have been named as defendants. In my view, the Commission in future
cases normally should not join rank and file employees or persons outside
the company *such as an analyst or reporter* who learns of inside informa-
tion." Speech of Hamer Budge to the New York Regional Group of the

## IV

Under the inside-trading and tipping rules set forth above, we find that there was no actionable violation by Dirks.[25] It is undisputed that Dirks himself was a stranger to Equity Funding, with no pre-existing fiduciary duty to its shareholders.[26] He took no action, directly or indirectly, that induced the shareholders or officers of Equity Funding to repose trust or confidence in him. There was no expectation by Dirks' sources that he would keep their information in confidence. Nor did Dirks misappropriate or illegally obtain the information about Equity Funding. Unless the insiders breached their *Cady, Roberts* duty to shareholders in disclosing the nonpublic information to Dirks, he breached no duty when he passed it on to investors as well as to the Wall Street Journal.

---

American Society of Corporate Secretaries, Inc. (Nov. 18, 1965), reprinted in The Texas Gulf Sulphur Case—What It Is and What It Isn't, The Corporate Secretary, No. 127, p. 6 (Dec. 17, 1965) (emphasis added).

[25] Dirks contends that he was not a "tippee" because the information he received constituted unverified allegations of fraud that were denied by management and were not "material facts" under the securities laws that required disclosure before trading. He also argues that the information he received was not truly "inside" information, *i. e.*, intended for a confidential corporate purpose, but was merely evidence of a crime. The Solicitor General agrees. See Brief for United States as *Amicus Curiae* 22. We need not decide, however, whether the information constituted "material facts," or whether information concerning corporate crime is properly characterized as "inside information." For purposes of deciding this case, we assume the correctness of the SEC's findings, accepted by the Court of Appeals, that petitioner was a tippee of material inside information.

[26] Judge Wright found that Dirks acquired a fiduciary duty by virtue of his position as an employee of a broker-dealer. See 220 U. S. App. D. C., at 325–327, 681 F. 2d, at 840–842. The SEC, however, did not consider Judge Wright's novel theory in its decision, nor did it present that theory to the Court of Appeals. The SEC also has not argued Judge Wright's theory in this Court. See Brief for Respondent 21, n. 27. The merits of such a duty are therefore not before the Court. See *SEC* v. *Chenery Corp.*, 332 U. S. 194, 196–197 (1947).

It is clear that neither Secrist nor the other Equity Funding employees violated their *Cady, Roberts* duty to the corporation's shareholders by providing information to Dirks.[27]

---

[27] In this Court, the SEC appears to contend that an insider invariably violates a fiduciary duty to the corporation's shareholders by transmitting nonpublic corporate information to an outsider when he has reason to believe that the outsider may use it to the disadvantage of the shareholders. "Thus, regardless of any ultimate motive to bring to public attention the derelictions at Equity Funding, Secrist breached his duty to Equity Funding shareholders." Brief for Respondent 31. This perceived "duty" differs markedly from the one that the SEC identified in *Cady, Roberts* and that has been the basis for federal tippee-trading rules to date. In fact, the SEC did not charge Secrist with any wrongdoing, and we do not understand the SEC to have relied on any theory of a breach of duty by Secrist in finding that Dirks breached his duty to Equity Funding's shareholders. See App. 250 (decision of Administrative Law Judge) ("One who knows himself to be a beneficiary of non-public, selectively disclosed inside information must fully disclose or refrain from trading"); Record, SEC's Reply to Notice of Supplemental Authority before the SEC 4 ("If Secrist was acting properly, Dirks inherited a duty to [Equity Funding]'s shareholders to refrain from improper private use of the information"); Brief for SEC in No. 81–1243 (CADC), pp. 47–50; *id.*, at 51 ("[K]nowing possession of inside information by any person imposes a duty to abstain or disclose"); *id.*, at 52–54; *id.*, at 55 ("[T]his obligation arises not from the manner in which such information is acquired . . ."); 220 U. S. App. D. C., at 322–323, 681 F. 2d, at 837–838 (Wright, J.).

The dissent argues that "Secrist violated his duty to Equity Funding shareholders by transmitting material nonpublic information to Dirks with the intention that Dirks would cause his clients to trade on that information." *Post*, at 678–679. By perceiving a breach of fiduciary duty whenever inside information is intentionally disclosed to securities traders, the dissenting opinion effectively would achieve the same result as the SEC's theory below, *i. e.*, mere possession of inside information while trading would be viewed as a Rule 10b–5 violation. But *Chiarella* made it explicitly clear that there is no general duty to forgo market transactions "based on material, nonpublic information." 445 U. S., at 233. Such a duty would "depar[t] radically from the established doctrine that duty arises from a specific relationship between two parties." *Ibid.* See *supra*, at 654–655.

Moreover, to constitute a violation of Rule 10b–5, there must be fraud. See *Ernst & Ernst* v. *Hochfelder*, 425 U. S., at 199 (statutory words "manipulative," "device," and "contrivance . . . connot[e] intentional or willful conduct designed to *deceive or defraud* investors by controlling or

The tippers received no monetary or personal benefit for revealing Equity Funding's secrets, nor was their purpose to make a gift of valuable information to Dirks. As the facts of this case clearly indicate, the tippers were motivated by a desire to expose the fraud. See *supra*, at 648–649. In the absence of a breach of duty to shareholders by the insiders, there was no derivative breach by Dirks. See n. 20, *supra*. Dirks therefore could not have been "a participant after the fact in [an] insider's breach of a fiduciary duty." *Chiarella*, 445 U. S., at 230, n. 12.

## V

We conclude that Dirks, in the circumstances of this case, had no duty to abstain from use of the inside information that he obtained. The judgment of the Court of Appeals therefore is

*Reversed.*

JUSTICE BLACKMUN, with whom JUSTICE BRENNAN and JUSTICE MARSHALL join, dissenting.

The Court today takes still another step to limit the protections provided investors by § 10(b) of the Securities Ex-

---

artificially affecting the price of securities") (emphasis added). There is no evidence that Secrist's disclosure was intended to or did in fact "deceive or defraud" anyone. Secrist certainly intended to convey relevant information that management was unlawfully concealing, and—so far as the record shows—he believed that persuading Dirks to investigate was the best way to disclose the fraud. Other efforts had proved fruitless. Under any objective standard, Secrist received no direct or indirect personal benefit from the disclosure.

The dissenting opinion focuses on shareholder "losses," "injury," and "damages," but in many cases there may be no clear causal connection between inside trading and outsiders' losses. In one sense, as market values fluctuate and investors act on inevitably incomplete or incorrect information, there always are winners and losers; but those who have "lost" have not necessarily been defrauded. On the other hand, inside trading for personal gain is fraudulent, and is a violation of the federal securities laws. See Dooley, *supra* n. 21, at 39–41, 70. Thus, there is little legal significance to the dissent's argument that Secrist and Dirks created new "victims" by disclosing the information to persons who traded. In fact, they prevented the fraud from continuing and victimizing many more investors.

change Act of 1934.[1]  See *Chiarella* v. *United States*, 445 U. S. 222, 246 (1980) (dissenting opinion).  The device employed in this case engrafts a special motivational requirement on the fiduciary duty doctrine.  This innovation excuses a knowing and intentional violation of an insider's duty to shareholders if the insider does not act from a motive of personal gain.  Even on the extraordinary facts of this case, such an innovation is not justified.

## I

As the Court recognizes, *ante*, at 658, n. 18, the facts here are unusual.  After a meeting with Ronald Secrist, a former Equity Funding employee, on March 7, 1973, App. 226, petitioner Raymond Dirks found himself in possession of material nonpublic information of massive fraud within the company.[2]  In the Court's words, "[h]e uncovered . . . startling information that required no analysis or exercise of judgment as to

[1] See, *e. g.*, *Blue Chip Stamps* v. *Manor Drug Stores*, 421 U. S. 723 (1975); *Ernst & Ernst* v. *Hochfelder*, 425 U. S. 185 (1976); *Piper* v. *Chris-Craft Industries, Inc.*, 430 U. S. 1 (1977); *Chiarella* v. *United States*, 445 U. S. 222 (1980); *Aaron* v. *SEC*, 446 U. S. 680 (1980).  This trend frustrates the congressional intent that the securities laws be interpreted flexibly to protect investors, see *Affiliated Ute Citizens* v. *United States*, 406 U. S. 128, 151 (1972); *SEC* v. *Capital Gains Research Bureau, Inc.*, 375 U. S. 180, 186 (1963), and to regulate deceptive practices "detrimental to the interests of the investor," S. Rep. No. 792, 73d Cong., 2d Sess., 18 (1934); see H. R. Rep. No. 1383, 73d Cong., 2d Sess., 10 (1934).  Moreover, the Court continues to refuse to accord to SEC administrative decisions the deference it normally gives to an agency's interpretation of its own statute.  See, *e. g.*, *Blum* v. *Bacon*, 457 U. S. 132 (1982).

[2] Unknown to Dirks, Secrist also told his story to New York insurance regulators the same day.  App. 23.  They immediately assured themselves that Equity Funding's New York subsidiary had sufficient assets to cover its outstanding policies and then passed on the information to California regulators who in turn informed Illinois regulators.  Illinois investigators, later joined by California officials, conducted a surprise audit of Equity Funding's Illinois subsidiary, *id.*, at 87–88, to find $22 million of the subsidiary's assets missing.  On March 30, these authorities seized control of the Illinois subsidiary.  *Id.*, at 271.

its market relevance." *Ibid.* In disclosing that information to Dirks, Secrist intended that Dirks would disseminate the information to his clients, those clients would unload their Equity Funding securities on the market, and the price would fall precipitously, thereby triggering a reaction from the authorities. App. 16, 25, 27.

Dirks complied with his informant's wishes. Instead of reporting that information to the Securities and Exchange Commission (SEC or Commission) or to other regulatory agencies, Dirks began to disseminate the information to his clients and undertook his own investigation.[3] One of his first steps was to direct his associates at Delafield Childs to draw up a list of Delafield clients holding Equity Funding securities. On March 12, eight days before Dirks flew to Los Angeles to investigate Secrist's story, he reported the full allegations to Boston Company Institutional Investors, Inc., which on March 15 and 16 sold approximately $1.2 million of Equity securities.[4] See *id.,* at 199. As he gathered more

_____

[3] In the same administrative proceeding at issue here, the Administrative Law Judge (ALJ) found that Dirks' clients—five institutional investment advisers—violated § 17(a) of the Securities Act of 1933, 15 U. S. C. § 77q(a), § 10(b) of the Securities Exchange Act of 1934, 15 U. S. C. § 78j(b), and Rule 10b–5, 17 CFR § 240.10b–5 (1983), by trading on Dirks' tips. App. 297. All the clients were censured, except Dreyfus Corporation. The ALJ found that Dreyfus had made significant efforts to disclose the information to Goldman, Sachs, the purchaser of its securities. *Id.,* at 299, 301. None of Dirks' clients appealed these determinations. App. to Pet. for Cert. B–2, n. 1.

[4] The Court's implicit suggestion that Dirks did not gain by this selective dissemination of advice, *ante,* at 649, n. 2, is inaccurate. The ALJ found that because of Dirks' information, Boston Company Institutional Investors, Inc., directed business to Delafield Childs that generated approximately $25,000 in commissions. App. 199, 204–205. While it is true that the exact economic benefit gained by Delafield Childs due to Dirks' activities is unknowable because of the structure of compensation in the securities market, there can be no doubt that Delafield and Dirks gained both monetary rewards and enhanced reputations for "looking after" their clients.

information, he selectively disclosed it to his clients. To those holding Equity Funding securities he gave the "hard" story—all the allegations; others received the "soft" story—a recitation of vague factors that might reflect adversely on Equity Funding's management. See *id.*, at 211, n. 24.

Dirks' attempts to disseminate the information to non-clients were feeble, at best. On March 12, he left a message for Herbert Lawson, the San Francisco bureau chief of The Wall Street Journal. Not until March 19 and 20 did he call Lawson again, and outline the situation. William Blundell, a Journal investigative reporter based in Los Angeles, got in touch with Dirks about his March 20 telephone call. On March 21, Dirks met with Blundell in Los Angeles. Blundell began his own investigation, relying in part on Dirks' contacts, and on March 23 telephoned Stanley Sporkin, the SEC's Deputy Director of Enforcement. On March 26, the next business day, Sporkin and his staff interviewed Blundell and asked to see Dirks the following morning. Trading was halted by the New York Stock Exchange at about the same time Dirks was talking to Los Angeles SEC personnel. The next day, March 28, the SEC suspended trading in Equity Funding securities. By that time, Dirks' clients had unloaded close to $15 million of Equity Funding stock and the price had plummeted from $26 to $15. The effect of Dirks' selective dissemination of Secrist's information was that Dirks' clients were able to shift the losses that were inevitable due to the Equity Funding fraud from themselves to uninformed market participants.

## II

### A

No one questions that Secrist himself could not trade on his inside information to the disadvantage of uninformed shareholders and purchasers of Equity Funding securities. See Brief for United States as *Amicus Curiae* 19, n. 12. Unlike the printer in *Chiarella*, Secrist stood in a fiduciary relation-

ship with these shareholders. As the Court states, *ante,* at 653, corporate insiders have an affirmative duty of disclosure when trading with shareholders of the corporation. See *Chiarella,* 445 U. S., at 227. This duty extends as well to purchasers of the corporation's securities. *Id.,* at 227, n. 8, citing *Gratz* v. *Claughton,* 187 F. 2d 46, 49 (CA2), cert. denied, 341 U. S. 920 (1951).

The Court also acknowledges that Secrist could not do by proxy what he was prohibited from doing personally. *Ante,* at 659; *Mosser* v. *Darrow,* 341 U. S. 267, 272 (1951). But this is precisely what Secrist did. Secrist used Dirks to disseminate information to Dirks' clients, who in turn dumped stock on unknowing purchasers. Secrist thus intended Dirks to injure the purchasers of Equity Funding securities to whom Secrist had a duty to disclose. Accepting the Court's view of tippee liability,[5] it appears that Dirks' knowledge of this breach makes him liable as a participant in the breach after the fact. *Ante,* at 659, 667; *Chiarella,* 445 U. S., at 230, n. 12.

## B

The Court holds, however, that Dirks is not liable because Secrist did not violate his duty; according to the Court, this is so because Secrist did not have the improper purpose of personal gain. *Ante,* at 662–663, 666–667. In so doing, the Court imposes a new, subjective limitation on the scope of the duty owed by insiders to shareholders. The novelty of this limitation is reflected in the Court's lack of support for it.[6]

---

[5] I interpret the Court's opinion to impose liability on tippees like Dirks when the tippee knows or has reason to know that the information is material and nonpublic and was obtained through a breach of duty by selective revelation or otherwise. See *In re Investors Management Co.,* 44 S. E. C. 633, 641 (1971).

[6] The Court cites only a footnote in an SEC decision and Professor Brudney to support its rule. *Ante,* at 663–664. The footnote, however, merely identifies one result the securities laws are intended to prevent. It does not define the nature of the duty itself. See n. 9, *infra.* Professor Brudney's quoted statement appears in the context of his assertion that the

The insider's duty is owed directly to the corporation's shareholders.[7] See Langevoort, Insider Trading and the Fiduciary Principle: A Post-*Chiarella* Restatement, 70 Calif. L. Rev. 1, 5 (1982); 3A W. Fletcher, Cyclopedia of the Law of Private Corporations § 1168.2, pp. 288–289 (rev. ed. 1975). As *Chiarella* recognized, it is based on the relationship of trust and confidence between the insider and the shareholder. 445 U. S., at 228. That relationship assures the shareholder that the insider may not take actions that will harm him unfairly.[8] The affirmative duty of disclosure pro-

duty of insiders to disclose prior to trading with shareholders is in large part a mechanism to correct the information available to noninsiders. Professor Brudney simply recognizes that the most common motive for breaching this duty is personal gain; he does not state, however, that the duty prevents only personal aggrandizement. Insiders, Outsiders, and Informational Advantages Under the Federal Securities Laws, 93 Harv. L. Rev. 322, 345–348 (1979). Surely, the Court does not now adopt Professor Brudney's access-to-information theory, a close cousin to the equality-of-information theory it accuses the SEC of harboring. See *ante*, at 655–658.

[7] The Court correctly distinguishes this duty from the duty of an insider to the corporation not to mismanage corporate affairs or to misappropriate corporate assets. *Ante*, at 653, n. 10. That duty also can be breached when the insider trades in corporate securities on the basis of inside information. Although a shareholder suing in the name of the corporation can recover for the corporation damages for any injury the insider causes by the breach of this distinct duty, *Diamond* v. *Oreamuno*, 24 N. Y. 2d 494, 498, 248 N. E. 2d 910, 912 (1969); see *Thomas* v. *Roblin Industries, Inc.*, 520 F. 2d 1393, 1397 (CA3 1975), insider trading generally does not injure the corporation itself. See Langevoort, Insider Trading and the Fiduciary Principle: A Post-*Chiarella* Restatement, 70 Calif. L. Rev. 1, 2, n. 5, 28, n. 111 (1982).

[8] As it did in *Chiarella*, 445 U. S., at 226–229, the Court adopts the *Cady, Roberts* formulation of the duty. *Ante*, at 653–654.

"Analytically, the obligation rests on two principal elements; first, the existence of a relationship giving access, directly or indirectly, to information intended to be available only for a corporate purpose and not for the personal benefit of anyone, and second, the inherent unfairness involved where a party takes advantage of such information knowing it is unavail-

tects against this injury. See *Pepper* v. *Litton,* 308 U. S. 295, 307, n. 15 (1939); *Strong* v. *Repide,* 213 U. S. 419, 431–434 (1909); see also *Chiarella,* 445 U. S., at 228, n. 10; cf. *Pepper,* 308 U. S., at 307 (fiduciary obligation to corporation exists for corporation's protection).

## C

The fact that the insider himself does not benefit from the breach does not eradicate the shareholder's injury.[9] Cf. Restatement (Second) of Trusts § 205, Comments *c* and *d* (1959) (trustee liable for acts causing diminution of value of trust); 3

---

able to those with whom he is dealing." *In re Cady, Roberts & Co.,* 40 S. E. C. 907, 912 (1961) (footnote omitted).

The first element—on which *Chiarella's* holding rests—establishes the type of relationship that must exist between the parties before a duty to disclose is present. The second—not addressed by *Chiarella*—identifies the harm that the duty protects against: the inherent unfairness to the shareholder caused when an insider trades with him on the basis of undisclosed inside information.

[9] Without doubt, breaches of the insider's duty occur most often when an insider seeks personal aggrandizement at the expense of shareholders. Because of this, descriptions of the duty to disclose are often coupled with statements that the duty prevents unjust enrichment. See, *e. g., In re Cady, Roberts & Co.,* 40 S. E. C., at 912, n. 15; Langevoort, 70 Calif. L. Rev., at 19. Private gain is certainly a strong motivation for breaching the duty.

It is, however, not an element of the breach of this duty. The reference to personal gain in *Cady, Roberts* for example, is appended to the first element underlying the duty which requires that an insider have a special relationship to corporate information that he cannot appropriate for his own benefit. See n. 8, *supra.* It does not limit the second element which addresses the injury to the shareholder and is at issue here. See *ibid.* In fact, *Cady, Roberts* describes the duty more precisely in a later footnote: "In the circumstances, [the insider's] relationship to his customers was such that he would have a duty not to take a position adverse to them, not to take secret profits at their expense, not to misrepresent facts to them, and in general to place their interests ahead of his own." 40 S. E. C., at 916, n. 31. This statement makes clear that enrichment of the insider himself is simply one of the results the duty attempts to prevent.

A. Scott, Law of Trusts § 205, p. 1665 (3d ed. 1967) (trustee liable for any losses to trust caused by his breach). It makes no difference to the shareholder whether the corporate insider gained or intended to gain personally from the transaction; the shareholder still has lost because of the insider's misuse of nonpublic information. The duty is addressed not to the insider's motives,[10] but to his actions and their consequences on the shareholder. Personal gain is not an element of the breach of this duty.[11]

---

[10] Of course, an insider is not liable in a Rule 10b–5 administrative action unless he has the requisite scienter. *Aaron* v. *SEC*, 446 U. S., at 691. He must know that his conduct violates or intend that it violate his duty. Secrist obviously knew and intended that Dirks would cause trading on the inside information and that Equity Funding shareholders would be harmed. The scienter requirement addresses the intent necessary to support liability; it does not address the motives behind the intent.

[11] The Court seems concerned that this case bears on insiders' contacts with analysts for valid corporate reasons. *Ante,* at 658–659. It also fears that insiders may not be able to determine whether the information transmitted is material or nonpublic. *Ante,* at 661–662. When the disclosure is to an investment banker or some other adviser, however, there is normally no breach because the insider does not have scienter: he does not intend that the inside information be used for trading purposes to the disadvantage of shareholders. Moreover, if the insider in good faith does not believe that the information is material or nonpublic, he also lacks the necessary scienter. *Ernst & Ernst* v. *Hochfelder*, 425 U. S., at 197. In fact, the scienter requirement functions in part to protect good-faith errors of this type. *Id.,* at 211, n. 31.

Should the adviser receiving the information use it to trade, it may breach a separate contractual or other duty to the corporation not to misuse the information. Absent such an arrangement, however, the adviser is not barred by Rule 10b–5 from trading on that information if it believes that the insider has not breached any duty to his shareholders. See *Walton* v. *Morgan Stanley & Co.*, 623 F. 2d 796, 798–799 (CA2 1980).

The situation here, of course, is radically different. *Ante,* at 658, n. 18 (Dirks received information requiring no analysis "as to its market relevance"). Secrist divulged the information for the precise purpose of causing Dirks' clients to trade on it. I fail to understand how imposing liability on Dirks will affect legitimate insider-analyst contacts.

This conclusion is borne out by the Court's decision in *Mosser* v. *Darrow*, 341 U. S. 267 (1951). There, the Court faced an analogous situation: a reorganization trustee engaged two employee-promoters of subsidiaries of the companies being reorganized to provide services that the trustee considered to be essential to the successful operation of the trust. In order to secure their services, the trustee expressly agreed with the employees that they could continue to trade in the securities of the subsidiaries. The employees then turned their inside position into substantial profits at the expense both of the trust and of other holders of the companies' securities.

The Court acknowledged that the trustee neither intended to nor did in actual fact benefit from this arrangement; his motives were completely selfless and devoted to the companies. *Id.*, at 275. The Court, nevertheless, found the trustee liable to the estate for the activities of the employees he authorized.[12] The Court described the trustee's defalcation as "a willful and deliberate setting up of an interest in employees adverse to that of the trust." *Id.*, at 272. The breach did not depend on the trustee's personal gain, and his motives in violating his duty were irrelevant; like Secrist, the trustee intended that others would abuse the inside information for their personal gain. Cf. *Dodge* v. *Ford Motor Co.*, 204 Mich. 459, 506–509, 170 N. W. 668, 684–685 (1919) (Henry Ford's philanthropic motives did not permit him to

---

[12] The duty involved in *Mosser* was the duty to the corporation in trust not to misappropriate its assets. This duty, of course, differs from the duty to shareholders involved in this case. See n. 7, *supra*. Trustees are also subject to a higher standard of care than scienter. 3 A. Scott, Law of Trusts § 201, p. 1650 (3d ed. 1967). In addition, strict trustees are bound not to trade in securities at all. See Langevoort, 70 Calif. L. Rev., at 2, n. 5. These differences, however, are irrelevant to the principle of *Mosser* that the motive of personal gain is not essential to a trustee's liability. In *Mosser*, as here, personal gain accrued to the tippees. See 341 U. S., at 273.

set Ford Motor Company dividend policies to benefit public at expense of shareholders).

As *Mosser* demonstrates, the breach consists in taking action disadvantageous to the person to whom one owes a duty. In this case, Secrist owed a duty to purchasers of Equity Funding shares. The Court's addition of the bad-purpose element to a breach-of-fiduciary-duty claim is flatly inconsistent with the principle of *Mosser*. I do not join this limitation of the scope of an insider's fiduciary duty to shareholders.[13]

### III

The improper-purpose requirement not only has no basis in law, but it also rests implicitly on a policy that I cannot accept. The Court justifies Secrist's and Dirks' action because the general benefit derived from the violation of Secrist's duty to shareholders outweighed the harm caused to those

---

[13] Although I disagree in principle with the Court's requirement of an improper motive, I also note that the requirement adds to the administrative and judicial burden in Rule 10b–5 cases. Assuming the validity of the requirement, the SEC's approach—a violation occurs when the insider knows that the tippee will trade with the information, Brief for Respondent 31— can be seen as a presumption that the insider gains from the tipping. The Court now requires a case-by-case determination, thus prohibiting such a presumption.

The Court acknowledges the burdens and difficulties of this approach, but asserts that a principle is needed to guide market participants. *Ante*, at 664. I fail to see how the Court's rule has any practical advantage over the SEC's presumption. The Court's approach is particularly difficult to administer when the insider is not directly enriched monetarily by the trading he induces. For example, the Court does not explain why the benefit Secrist obtained—the good feeling of exposing a fraud and his enhanced reputation—is any different from the benefit to an insider who gives the information as a gift to a friend or relative. Under the Court's somewhat cynical view, gifts involve personal gain. See *ibid*. Secrist surely gave Dirks a gift of the commissions Dirks made on the deal in order to induce him to disseminate the information. The distinction between pure altruism and self-interest has puzzled philosophers for centuries; there is no reason to believe that courts and administrative law judges will have an easier time with it.

shareholders, see Heller, *Chiarella*, SEC Rule 14e–3 and *Dirks:* "Fairness" versus Economic Theory, 37 Bus. Lawyer 517, 550 (1982); Easterbrook, Insider Trading, Secret Agents, Evidentiary Privileges, and the Production of Information, 1981 S. Ct. Rev. 309, 338—in other words, because the end justified the means.   Under this view, the benefit conferred on society by Secrist's and Dirks' activities may be paid for with the losses caused to shareholders trading with Dirks' clients.[14]

Although Secrist's general motive to expose the Equity Funding fraud was laudable, the means he chose were not. Moreover, even assuming that Dirks played a substantial role in exposing the fraud,[15] he and his clients should not profit from the information they obtained from Secrist.   Misprision of a felony long has been against public policy.   *Branzburg* v. *Hayes*, 408 U. S. 665, 696–697 (1972); see 18 U. S. C. § 4.   A person cannot condition his transmission of information of a crime on a financial award.   As a citizen, Dirks had at least an ethical obligation to report the information to the proper authorities.   See *ante*, at 661, n. 21.   The Court's holding is deficient in policy terms not because it fails to create a legal

[14] This position seems little different from the theory that insider trading should be permitted because it brings relevant information to the market. See H. Manne, Insider Trading and the Stock Market 59–76, 111–146 (1966); Manne, Insider Trading and the Law Professors, 23 Vand. L. Rev. 547, 565–576 (1970).   The Court also seems to embrace a variant of that extreme theory, which postulates that insider trading causes no harm at all to those who purchase from the insider.   *Ante*, at 666–667, n. 27.   Both the theory and its variant sit at the opposite end of the theoretical spectrum from the much maligned equality-of-information theory, and never have been adopted by Congress or ratified by this Court.   See Langevoort, 70 Calif. L. Rev., at 1, and n. 1.   The theory rejects the existence of any enforceable principle of fairness between market participants.

[15] The Court uncritically accepts Dirks' own view of his role in uncovering the Equity Funding fraud.   See *ante*, at 658, n. 18.   It ignores the fact that Secrist gave the same information at the same time to state insurance regulators, who proceeded to expose massive fraud in a major Equity Funding subsidiary.   The fraud surfaced before Dirks ever spoke to the SEC.

norm out of that ethical norm, see *ibid.*, but because it actually rewards Dirks for his aiding and abetting.

Dirks and Secrist were under a duty to disclose the information or to refrain from trading on it.[16] I agree that disclosure in this case would have been difficult. *Ibid.* I also recognize that the SEC seemingly has been less than helpful in its view of the nature of disclosure necessary to satisfy the disclose-or-refrain duty. The Commission tells persons with inside information that they cannot trade on that information unless they disclose; it refuses, however, to tell them how to disclose.[17] See *In re Faberge, Inc.*, 45 S. E. C. 249, 256 (1973) (disclosure requires public release through public media designed to reach investing public generally). This seems to be a less than sensible policy, which it is incumbent on the Commission to correct. The Court, however, has no authority to remedy the problem by opening a hole in the congressionally mandated prohibition on insider trading, thus rewarding such trading.

## IV

In my view, Secrist violated his duty to Equity Funding shareholders by transmitting material nonpublic information

---

[16] Secrist did pass on his information to regulatory authorities. His good but misguided motive may be the reason the SEC did not join him in the administrative proceedings against Dirks and his clients. The fact that the SEC, in an exercise of prosecutorial discretion, did not charge Secrist under Rule 10b–5 says nothing about the applicable law. Cf. *ante*, at 665, n. 25 (suggesting otherwise). Nor does the fact that the SEC took an unsupportable legal position in proceedings below indicate that neither Secrist nor Dirks is liable under any theory. Cf. *ibid.* (same).

[17] At oral argument, the SEC's view was that Dirks' obligation to disclose would not be satisfied by reporting the information to the SEC. Tr. of Oral Arg. 27, quoted *ante*, at 661, n. 21. This position is in apparent conflict with the statement in its brief that speaks favorably of a safe harbor rule under which an investor satisfies his obligation to disclose by reporting the information to the Commission and then waiting a set period before trading. Brief for Respondent 43–44. The SEC, however, has neither proposed nor adopted a rule to this effect, and thus persons such as Dirks have no real option other than to refrain from trading.

to Dirks with the intention that Dirks would cause his clients to trade on that information. Dirks, therefore, was under a duty to make the information publicly available or to refrain from actions that he knew would lead to trading. Because Dirks caused his clients to trade, he violated § 10(b) and Rule 10b–5. Any other result is a disservice to this country's attempt to provide fair and efficient capital markets. I dissent.