SECURITIES AND EXCHANGE
COMMISSION, Plaintiff,

v.

Barry L. SWITZER; Lee Allan Smith;
Sedwyn T. Kennedy; Harold D. Deem;
Harold D. Hodges; Robert E. Amyx;
and Robert M. Hoover, Jr., Defendants.

Civ. A. No. Civ–83–225–Sf.

United States District Court,
W.D. Oklahoma.

July 2, 1984.

T. Christopher Browne, Nancy E. McGinley, S.E.C., Fort Worth, Tex., for plaintiff.

Robert G. Grove, Grove & Grove, David Machanic, Michael Minnis, Pierson, Ball & Dowd, Harry A. Woods, Jr., Crowe & Dunlevy, Oklahoma City, Okl., Frederick T. Spindel, Washington, D.C., Daniel S. Greenfeld, Seyfarth, Shaw, Fairweather & Geraldson, New York City, for defendants.

## MEMORANDUM AND ORDER

SAFFELS, District Judge, Sitting by Designation.

This action brought by the Securities and Exchange Commission [hereinafter SEC] was tried to the court on March 19–22, 1984. It involved allegations of violations of Section 10(b) of the Securities Exchange Act of 1934 and violations of Commission Rule 10b–5. On the basis of the following findings of fact and conclusions of law, the court shall enter judgment on behalf of the defendants.

### Findings of Fact

The following findings of fact have been stipulated to by all parties and accepted by the court and are set forth as follows.

1. The SEC, pursuant to the authority granted to it by Sections 10(b), 16(a) and 23(a) of the Securities Exchange Act of 1934 [15 U.S.C. 78j(b), 78p(a) and 78w(a)] has promulgated Rules 10b–5, 16a–1 and

16a–8 [17 C.F.R. 240.10b–5, 240.16a–1 and 240.16a–8], which have been in effect at all times mentioned in the complaint.

2. This court has jurisdiction over this action pursuant to Section 27 of the Securities Exchange Act [15 U.S.C. 78aa].

3. The SEC brings this action pursuant to Sections 21(d) and 21(e) of the Securities Exchange Act [15 U.S.C. 78u(d) and 78u(e)].

4. The defendants, directly or indirectly, made use of the means and instrumentalities of interstate commerce and of the mails in connection with the transactions, acts, practices and courses of business alleged in the complaint.

5. Certain of the transactions, acts, practices and courses of business alleged in the complaint as violations of, and aiding and abetting violations of, the Securities Exchange Act have occurred in the Western District of Oklahoma; and certain of the defendants can be found, inhabit or transact business in the Western District of Oklahoma.

6. Barry L. Switzer resides at 2811 Castlewood Drive, Norman, Oklahoma (73070). At all times mentioned in the complaint, Switzer was the head football coach at the University of Oklahoma in Norman, Oklahoma.

7. Lee Allan Smith resides at 6033 Riviera Drive, Oklahoma City, Oklahoma (73112). At all times mentioned in the complaint, Smith was General Manager of television station KTVY in Oklahoma City, Oklahoma.

8. Sedwyn T. Kennedy lives in the Oklahoma City, Oklahoma area. At all times mentioned in the complaint, Kennedy held an ownership interest in and operated restaurants located in the Oklahoma City, Oklahoma, area.

9. Harold D. Deem resides in Texas. Until 1975, he was involved in the restaurant business. At all times mentioned in the complaint, Deem managed his own investments, and he was a partner, along with Kennedy, in S & H Investments, an investment partnership.

10. Harold L. Hodges resides at 3215 Thornridge Road, Oklahoma City, Oklahoma (73120), and/or 2301 Grand Boulevard, Oklahoma City, Oklahoma (73116). At all times mentioned in the complaint, Hodges was the Owner and President of Core Oil and Gas, as well as the Owner and President of Bill Hodges Truck Company, both located in Oklahoma City, Oklahoma.

11. Robert E. Amyx resides at 3236 Rock Hollow, Oklahoma City, Oklahoma (74120). At all times mentioned in the complaint, Amyx was Vice President of Core Oil and Gas and Vice President of Bill Hodges Truck Company, and has been a partner, along with Hodges, in Hodges, Amyx, Cross and Hodges, an investment partnership.

12. Robert M. Hoover, Jr. resides at 7209 Waverly, Oklahoma City, Oklahoma (73120). At all times mentioned in the complaint, Hoover was Chairman of the Board of Directors of Oklahoma Energies Corporation, a publicly-traded company, located in Oklahoma City, Oklahoma.

13. Texas International Company [hereinafter TIC] is a Delaware corporation with principal offices located in Oklahoma City, Oklahoma. At all times mentioned in the complaint, TIC was engaged in, among other things, exploration for and development of oil and natural gas properties. At all times mentioned in the complaint, TIC's common stock was registered with the SEC pursuant to Section 12(b) of the Securities Exchange Act [15 U.S.C. 78*l* (b)] and was traded on the New York Stock Exchange, as well as other exchanges. On or about June 18, 1982, a wholly-owned subsidiary of TIC merged with Phoenix Resources Company [hereinafter Phoenix] and Phoenix became a wholly-owned subsidiary of TIC. At all times mentioned in the complaint prior to the merger, TIC owned in excess of fifty percent (50%) of the common stock of Phoenix, and, by reason of such ownership position, controlled Phoenix through election of three of the five members of the Phoenix Board of Directors.

14. Prior to the merger, Phoenix, the successor to King Resources Company, was a Maine corporation with principal offices located in Oklahoma City, Oklahoma. At all times mentioned in the complaint prior to the merger, Phoenix engaged in, among other things, exploration for and development of oil and natural gas properties. At all times mentioned in the complaint prior to the merger, Phoenix's common stock was registered with the SEC pursuant to Section 12(b) of the Securities Exchange Act [15 U.S.C. 78*l* (b) ] and was traded in the Over-the-Counter securities market on the National Association of Securities Dealers Automated Quotation System.

15. On or about Monday, June 8, 1981, after discussions with defendant Deem, Kennedy purchased five thousand (5,000) shares of Phoenix at Forty-Two and 75/100 Dollars ($42.75) per share through the S & H Investments account; and on or about Tuesday, June 9, 1981, after further discussions with Deem, Kennedy purchased an additional one thousand (1,000) shares of Phoenix at Forty-Nine Dollars ($49) per share.

16. On or about Wednesday, June 10, and Friday, June 12, 1981, S & H Investments sold all six thousand (6,000) shares of Phoenix at prices between Sixty and 50/100 Dollars ($60.50) and Sixty-Eight and 50/100 Dollars ($68.50) per share; the pretax profits realized by and divided between Kennedy and Deem on the basis of this trading amounted to approximately One Hundred Eighteen Thousand Five Hundred Eighty-Seven Dollars ($118,587).

17. On or about Monday, June 8, and Tuesday, June 9, 1981, Hoover purchased sixteen thousand five hundred (16,500) shares of Phoenix at prices between Forty-Three Dollars ($43) and Forty-Eight and 50/100 Dollars ($48.50) per share.

18. On or about Wednesday, June 10, 1981, after the public announcement, Hoover sold all sixteen thousand five hundred (16,500) shares of Phoenix at prices between Fifty-Nine Dollars ($59) and Sixty-Three and 50/100 Dollars ($63.50) per share; the pre-tax profits realized on the basis of trading over this three-day period amounted to approximately Two Hundred Sixty-Seven Thousand Seven Hundred Twenty-Eight Dollars ($267,728); and the pre-tax profits paid to and divided by Switzer and Smith amounted to approximately One Hundred Ten Thousand Four Hundred Ninety-One Dollars ($110,491).

19. Hodges and Amyx agreed to purchase Phoenix stock through the Hodges, Amyx, Cross and Hodges investment partnership account.

20. On or about Monday, June 8, and Tuesday, June 9, 1981, Amyx, on behalf of the Hodges, Amyx, Cross and Hodges investment partnership, purchased thirteen thousand (13,000) shares of Phoenix at prices between Forty-Three and 50/100 Dollars ($43.50) and Forty-Eight and 50/100 Dollars ($48.50) per share.

21. On or about Wednesday, June 10, and Thursday, June 11, 1981, the Hodges, Amyx, Cross and Hodges investment partnership sold all thirteen thousand (13,000) shares of Phoenix at prices between Fifty-Nine Dollars ($59) and Sixty-Five Dollars ($65) per share; the pre-tax profits realized by the investment partnership on the basis of trading over a four-day period amounted to approximately Two Hundred Five Thousand Fifty-Five Dollars ($205,055); and the pre-tax profits from such trading paid to and divided by Switzer and Smith amounted to approximately Eighty-Five Thousand Three Hundred Ten Dollars ($85,310).

22. The volume and price at which Phoenix common stock traded during the period of June 1–12, 1981, were as follows:

| DATE | | VOLUME | PRICE (Bid) |
|---|---|---|---|
| June 1 | | 8,800 | $42–1/2 |
| 2 | | 2,000 | $42 |
| 3 | | 10,600 | $39–1/2 |
| 4 | | 2,500 | $39–1/2 |
| 5 | | 6,800 | $42 |
| 6 | (Sat.) | ---------- | ---------- |
| 7 | (Sun.) | ---------- | ---------- |
| 8 | | 43,100 | $44–1/2 |
| 9 | | 31,800 | $47–1/2 |
| 10 | | 101,200 | $61 |
| 11 | | 63,800 | $66–1/2 |
| 12 | | 57,100 | $69–1/4 |

23. The volume and price at which Phoenix common stock traded on July 31, 1981, was three hundred seventy-nine thousand (379,000) shares at Seventy-Nine and 7/8 Dollars ($79–7/8) bid.

The following additional facts are found by the court:

24. In or about May of 1981, Scott C. Newquist [hereinafter Newquist], a principal at Morgan Stanley, an investment banking firm, contacted G. Platt to discuss the prospect of obtaining TIC as a client. A meeting eventually was arranged between personnel of Morgan Stanley and personnel of TIC for June 4 or 5, 1981, at the Morgan Stanley offices in New York.

25. On or about June 4 or 5, 1981, G. Platt and Robert Gist [hereinafter Gist] met with Newquist and other Morgan Stanley personnel at the Morgan Stanley offices in New York City, New York. Newquist thought the meeting was going to concern various means available to TIC to alter the relationship between itself and Phoenix. At the meeting, however, G. Platt, in addition to discussing TIC's options, discussed Phoenix and inquired whether Morgan Stanley would be willing to be retained by Phoenix to evaluate, among other alternatives, the disposition of Phoenix or its assets. Newquist advised G. Platt that prior to accepting Phoenix as a client, Morgan Stanley would require a unanimous vote of the Phoenix Board of Directors, and further would have to conduct a "due diligence" inquiry, *i.e.*, a familiarization with the affairs of the company. By the time G. Platt and Gist returned to Oklahoma City on June 5, 1981, they had decided to recommend to the Phoenix Board that Morgan Stanley be retained to undertake a study of the company and evaluate the prompt disposition of Phoenix or its assets.

26. In June of 1981, G. Platt was Chairman of the Board and the Chief Executive Officer of TIC and served as a Director on the Phoenix Board of Directors. Gist, in June of 1981, was President of Phoenix. G. Platt, in essence, controlled the Phoenix Board of Directors because he could fire any member except Arthur Lipper.

27. Although Lipper, the only independent director on the Board, had opposed mergers of Phoenix in the past, he had never opposed liquidation of Phoenix, provided the liquidation was at fair market value.

28. The Board of Directors of Phoenix met on June 9, 1981, and agreed to formally request Morgan Stanley to be retained. A phone call was then made to Morgan Stanley on June 9, 1981, and Morgan Stanley formally agreed to be retained by Phoenix, subject only to completion of its "due diligence" inquiry.

29. On June 10, 1981, Phoenix made a public announcement that its Board of Directors had determined to consider the prompt disposition of the company or its assets (liquidation) and had retained an unidentified investment banking firm, later publicly identified as Morgan Stanley, to conduct an evaluation of Phoenix. At the time of the public announcement, Morgan Stanley had not completed its "due diligence" examination of Phoenix, and the actual acceptance by Morgan Stanley was contingent upon completion of the "due diligence" examination.

30. From at least the time of the Platt-Newquist meeting on or about June 4 or 5, 1981, when G. Platt and Gist determined to pursue a possible liquidation of Phoenix, to at least the time of the public announcement on or about June 10, 1981, the proposal to liquidate Phoenix and retain an investment banking firm to evaluate that proposal was non-public information. Furthermore, such information was likely to affect the investment decision of a reasonably prudent investor, *i.e.*, it was information which a reasonable investor would consider important in making his decision how to act because the pro-rata value of Phoenix assets could reasonably be expected to exceed the market price of its stock at the time of the public announcement. This made the information material.

31. During the days which followed the June 10, 1981, announcement, there were

no other market events to which the rise in Phoenix stock price could be attributed.

32. Barry Switzer is a well-recognized "celebrity" in Oklahoma and elsewhere. He has an interest in the oil and gas industry, as he is personally involved in various ventures within the industry.

33. Over the past several years, defendants Switzer, Kennedy, Deem, Smith, Hodges, Amyx and Hoover have acted together in varying combinations of persons (or in various groups of persons) in making investments. They have formed partnerships such as S & H Investments, Waverly Ltd., and Hodges, Amyx, Cross and Hodges, to assist them in their investment ventures. Often times, they trade on rumors or gossip they hear within the investing community. Profits and losses occurring as a result of stock investments made through these partnerships are shared by the members of the partnerships.

34. TIC had been considering various options for either consolidating or separating TIC and Phoenix for some time prior to its approaching Morgan Stanley on June 4 or 5, 1981. Rumors concerning these various options were circulating within the investing oil and gas community prior to June 4 or 5, 1981.

35. On June 6, 1981, four days prior to the public announcement concerning Phoenix, a state invitational secondary school track meet was held at John Jacobs Field on the University of Oklahoma campus. The track meet was a day long event. Several hundred spectators attended, including Barry Switzer, who arrived at the meet between 10:00 and 10:30 a.m. to watch his son compete, and George and Linda Platt, who arrived between 9:00 and 10:00 a.m. to watch their son compete. Soon after Switzer's arrival at the track meet, he and G. Platt recognized and greeted each other. Neither Switzer nor G. Platt knew that the other would be attending the meet.

36. G. Platt was a supporter of Oklahoma University football and had met Switzer at a few social engagements prior to June of 1981. TIC was a sponsor of Switzer's football show, "Play Back." G. Platt had season tickets to the OU football games for approximately five years. G. Platt had obtained autographs from Switzer for G. Platt's minor children, and had had his secretary telephone Switzer to request that his season tickets be upgraded. Upgrading of tickets was extended as a courtesy by Switzer to many season ticket holders. On at least two occasions Switzer had phoned G. Platt requesting continued sponsorship by TIC of Switzer's football television program. These calls were made at the urging of Tom Goodgame, General Manager of the television station which then produced "Play Back." As of June 5, 1981, Switzer knew that G. Platt was Chairman of the Board of TIC and further knew that TIC was a substantial shareholder of Phoenix because Switzer was a stockholder in TIC and thereby knew Phoenix was a subsidiary.

37. Neither G. Platt nor his wife Linda are particularly impressed by Switzer. They view him as "just a nice fellow."

38. Upon first greeting each other at the track meet, G. Platt and Switzer exchanged pleasantries. Switzer then departed and continued on through the bleachers.

39. Throughout the course of the day, G. Platt and Linda Platt generally remained in one place in the bleachers. Switzer, however, throughout the day moved around a great deal, at times speaking with his son or other participants and their families, signing autographs and watching the different events on the field. While moving about, Switzer joined the Platts to visit with them about three to five times. During these visits Switzer and the Platts talked about their sons' participation in the meet, the oil and gas business, the economy, football and their respective personal investments.

40. G. Platt and Switzer did not have any conversations regarding Phoenix or Morgan Stanley, nor did they have any conversations regarding any mergers, acquisitions, take-overs or possible liquidations of Phoenix in which Morgan Stanley would play a part. G. Platt did not make

any stock recommendations to Switzer, nor did he intentionally communicate material, non-public corporate information to Switzer about Phoenix during their conversations at the track meet. The information that Switzer heard at the track meet about Phoenix was overheard and was not the result of an intentional disclosure by G. Platt.

41. Sometime in the afternoon, after his last conversation with G. Platt, Switzer laid down on a row of bleachers behind the Platts to sunbathe while waiting for his son's next event. While Switzer was sunbathing, he overheard G. Platt talking to his wife about his trip to New York the prior day. In that conversation, G. Platt mentioned Morgan Stanley and his desire to dispose of or liquidate Phoenix. G. Platt further talked about several companies bidding on Phoenix. Switzer also overheard that an announcement of a "possible" liquidation of Phoenix might occur the following Thursday. Switzer remained on the bleachers behind the Platts for approximately twenty minutes then got up and continued to move about.

42. At this time Switzer had no knowledge as to whether the information he had overheard was confidential.

43. G. Platt was not conscious of Switzer's presence on the bleachers behind him that day, nor that Switzer had overheard any conversation.

44. G. Platt had returned home late the previous day from his meetings in New York, and his wife was to leave town for an entire week on the following day. Having minor children, it is the Platts' common practice to try to arrange for G. Platt to be at home when his wife is out of town. The day of the track meet provided the Platts with an opportunity to discuss their respective plans for the up-coming week. During this discussion, G. Platt's prior business activities in New York and its resultant obligations and appointments were mentioned. In addition, when G. Platt appears distracted, it is not uncommon for his wife to inquire of him what is on his mind. On these occasions, he will talk to her about his problems, even though she does not have an understanding of nor interest in business matters. On the day of the track meet, Phoenix was weighing upon the mind of G. Platt, as it had been for the past several years, prompting G. Platt to talk to his wife about it.

45. On June 6, 1981, after the track meet, Switzer returned home and looked up the price of Phoenix in the paper. He then had dinner with Sedwyn Kennedy, a close friend of both his and defendant Lee Allan Smith. In the past, they had all made investments through their partnership, SKS. Switzer told Kennedy he had overheard a conversation about the possible liquidation of Phoenix and that it would probably occur or be announced the next Thursday. Switzer told him the source was a gentlemen who was an executive with TIC. Switzer did not tell Kennedy the man was G. Platt. Switzer and Kennedy are close friends and have known each other since 1966.

46. By the end of the evening, Switzer and Kennedy had each expressed an intention to purchase Phoenix stock.

47. On Sunday, June 7, 1981, Kennedy telephoned Deem, his partner in S&H Investments, to discuss the possible purchase of Phoenix stock. Kennedy told Deem that Barry Switzer had talked to him about Phoenix, but did not give him any other details. As a result, Kennedy and Deem agreed to purchase shares of Phoenix through their partnership, S&H Investments.

48. On or about Monday, June 8, 1981, Kennedy purchased five thousand (5,000) shares of Phoenix stock at Forty-Two and 75/100 Dollars ($42.75) per share through the S&H Investments account; and on or about Tuesday, June 9, 1981, after further discussions with Deem, Kennedy purchased an additional one thousand (1,000) shares of Phoenix at Forty-Nine Dollars ($49) per share. (See stipulated fact No. 15, *supra*.)

49. On Sunday, June 7, 1981, Switzer called Lee Allan Smith, a close friend with whom he had previously entered joint in-

vestments. Switzer told Smith that he had been at a track meet on Saturday and had overheard some information regarding the possible liquidation or buy-out of Phoenix. Switzer attributed the information to "someone who should know," and said that he had overheard that Morgan Stanley was involved and that something could happen by Thursday of the following week. Switzer and Smith decided to approach Harold Hodges and Robert Hoover about providing the capital for buying some Phoenix stock with them because Smith and Switzer had insufficient available cash at that time to purchase a significant number of shares on their own. Hodges, Smith and Switzer were personal friends through participation in community and charitable activities in Oklahoma City. Hoover has known Smith for thirty years and has been a personal friend of both Smith and Switzer.

50. On Sunday, June 7, 1981, Switzer and Smith met with Hodges at the latter's offices. At this meeting, Switzer told Hodges that he had overheard some information that Phoenix stock was going to go up. Switzer did not state the source of the information, and Hodges did not inquire, because Switzer and Smith are good friends of his, and he often invests on information of this nature. During most of this meeting, Smith was occupied in making telephone calls on other matters in another area of the room.

51. At the conclusion of the meeting, it was agreed that Hodges would supply the capital and purchase the stock, and that any profits or losses would be split, fifty percent (50%) to Hodges and fifty percent (50%) to be divided between Smith and Switzer.

52. On Monday, June 8, 1981, Hodges told Robert Amyx that he had visited with Smith and Switzer the previous day and that they had told him they had heard a rumor that something favorable was going to happen regarding TIC or Phoenix, and instructed him to make stock purchases in both companies.

53. On Monday, June 8, and Tuesday, June 9, 1981, Robert Amyx, on behalf of the Hodges, Amyx, Cross and Hodges investment partnership, purchased thirteen thousand (13,000) shares of Phoenix, at prices between Forty-Three and 50/100 Dollars ($43.50) and Forty-Eight and 50/100 Dollars ($48.50) per share. (See stipulated fact No. 20, *supra.*)

54. Because Hodges did not know which company was going to have a stock price rise, he requested Amyx not only to purchase Phoenix stock, but also stock of TIC, through the Hodges, Amyx, Cross and Hodges investment partnership account.

55. At the same time that he made the Phoenix purchases, Amyx purchased twenty thousand (20,000) shares of TIC stock at Twenty-Seven Dollars ($27) and Twenty-Seven and 1/8 Dollars ($27–1/8) per share.

56. On Sunday, June 7, 1981, after their meeting with Hodges, Switzer and Smith met with Robert Hoover at his home, where he was having a party. Switzer and Smith arrived separately. Smith first discussed the matter with Hoover and did not mention where he had received the information. Switzer also told Hoover something was going to happen with Phoenix, but did not say from whom he had heard the information.

57. Hoover agreed to purchase Phoenix stock jointly with Smith and Switzer. Hoover advanced the capital and purchased the stock for his account, based on an understanding that any losses or profits would be split, fifty percent (50%) to Hoover, and the remaining fifty percent (50%) to be divided between Smith and Switzer.

58. Hoover purchased sixteen thousand (16,000) shares of Phoenix stock on or about Monday, June 8, or Tuesday, June 9, 1981. (See stipulated fact No. 17, *supra.*)

59. G. Platt did not learn of Switzer's purchase or sale of Phoenix stock, or of the conversation Switzer had overheard, until on or about March 10 or 11, 1982. On or about March 10 or 11, 1982, Switzer called G. Platt at Platt's condominium in Snow Mass, Colorado, and asked to meet with him because Switzer said something he had inadvertently done would affect Platt. At

the time Switzer was also staying in Snow Mass, Colorado. During this meeting, Switzer told G. Platt, for the first time, that Switzer had been sitting behind G. Platt and his wife at the track meet on June 6, 1981, and had overheard G. Platt's conversation with his wife regarding Phoenix, and that as a result of that overheard conversation, Switzer and other friends of his had subsequently purchased and sold Phoenix stock. G. Platt had heard as early as February of 1982 that Phoenix was under investigation by the SEC. After hearing the facts from Switzer, G. Platt told Switzer it was essential that they meet with Robert Gist as soon as G. Platt returned to Oklahoma City.

60. On or about March 22, 1982, G. Platt, Switzer and Gist met at TIC's offices and Switzer again related the facts he had told G. Platt on or about March 10 or 11, 1982.

61. G. Platt did not share in the profits made through the transactions in Phoenix stock by Switzer, Kennedy, Deem, Smith, Hodges, Amyx and Hoover, nor did he receive any other financial benefit as a result of those transactions.

62. G. Platt did not receive any direct or indirect pecuniary gain nor any reputational benefit likely to translate into future earnings due to Switzer's inadvertent receipt of the information regarding Phoenix.

63. G. Platt did not make any gift to Switzer at this time, nor has he ever made a gift to Switzer.

64. Neither Switzer, Kennedy, Smith, Deem, Hodges, Amyx nor Hoover has ever been employed by or been an officer or director of Phoenix or TIC, nor have any of these defendants ever had any business relationship with Phoenix or with G. Platt personally. None of these defendants is a relative or personal friend of G. Platt.

65. None of the defendants had a relationship of trust and confidence with Phoenix, its shareholders or G. Platt.

66. In June, 1981, neither Switzer, Smith, Kennedy, Deem, Hodges, Amyx nor Hoover had any information from any source as to whether there was in fact any prospective purchaser of the stock or assets of Phoenix, nor whether a liquidation of the company would actually take place.

67. Smith, Hodges, Amyx, Kennedy, Deem and Hoover did not know nor did they act in reckless disregard of circumstances through which they could have had a reason to believe that the information received by Switzer came from other than an overheard conversation. None of these defendants knew or acted in reckless disregard of circumstances through which they could have had a reason to believe that the information they received was disclosed by an insider of Phoenix for an improper purpose.

### Conclusions of Law

Based upon the foregoing findings of fact, the court makes the following conclusions of law.

■ 1. The information that defendants Switzer, Smith, Hodges, Amyx, Hoover, Kennedy and Deem received concerning Phoenix was material as of June 6, 1981, the date of the track meet. On that date, there was a substantial likelihood that, given all the circumstances, and contingencies involved, the information as received by Switzer and communicated to Kennedy, Smith, Hodges, Amyx, Hoover and Deem would have assumed actual significance in the deliberations of a reasonable shareholder. See *TSC Industries Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976).

■ 2. To constitute material information, the information need not necessarily relate to a past or existing condition or event. It may refer to a prospective event, even though the event may not occur, provided there appears to be a reasonable likelihood of its future occurrence. In situations where the event, if it should occur, could influence the stockholders' investment decision, the chance that it might well occur constitutes information that should be disclosed to the investor. See *Securities and Exchange Commission v. Texas*

*International Co.*, 498 F.Supp. 1231 (N.D. Ill.1980); *Sonesta International Hotels Corp. v. Willington Associates*, 483 F.2d 247 (2nd Cir.1973). In both *Sonesta* and *Texas International*, facts which referred to prospective and contingent events were deemed material because there appeared to be a reasonable likelihood of the occurrence of the future events. The existence of the decision to evaluate the liquidation of Phoenix, coupled with the affirmative steps of hiring Morgan Stanley as an investment banker, although based upon some contingencies, constituted material information as of June 6, 1981, the date of the track meet.

3. It is undisputed that G. Platt was an insider in regard to both TIC and Phoenix as of June 6, 1981.

4. Switzer, Kennedy, Deem, Smith, Hodges, Amyx and Hoover were not insiders of Phoenix. None of them had any fiduciary duty to the stockholders of TIC or Phoenix by virtue of their positions. None of them were employed by Phoenix, nor did they have any position of trust or confidence with Phoenix. These defendants were strangers to Phoenix and had no preexisting fiduciary duties to the shareholders of Phoenix. In its recent opinion of *Dirks v. Securities Exchange Commission*, 463 U.S. 646, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983), the United States Supreme Court addressed tippee liability. The court pointed out that, unlike insiders who have independent fiduciary duties to both the corporation and its shareholders, the typical tippee has no such fiduciary relationship. In view of the absence of this fiduciary relationship, the court notes it has been unclear how a tippee acquires the *Cady, Roberts* duty to disclose or refrain from trading on inside information first stated in *In re Cady, Roberts & Co.*, 40 S.E.C. 907 (1961). Although the SEC, in *Dirks*, urged the court to accept what has become known as the "information" theory, which in essence states that anyone knowingly receiving non-public, material information acquires an insider fiduciary duty to disclose or abstain from trading, the court rejected this theory as they had

in *Chiarella v. United States*, 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980). The court in *Dirks* stated: "We reaffirm today that '[a] duty [to disclose] arises from the relationship between parties ... and not merely from one's ability to acquire information because of his position in the market.'" *Dirks*, 103 S.Ct. at 3263, quoting from *Chiarella v. United States*, 445 U.S. at 232–33, n. 14, 100 S.Ct. at 1116 n. 14. The court further stated in *Dirks*: "As we emphasized in *Chiarella*, mere possession of non-public information does not give rise to a duty to disclose or abstain; only a specific relationship does that. And we do not believe that the mere receipt of information from an insider creates such a special relationship between the tippee and the corporation's shareholders." 103 S.Ct. at 3262, n. 15.

6. Essentially, in *Dirks* the court found that the *Cady, Roberts* duty of a tippee "to disclose or abstain" is *derivative* from that of the insider's duty. The court stated:

> ... [S]ome tippees must assume an insider's duty to the shareholders not because they receive inside information, but rather because it has been made available to them *improperly*. And for Rule 10b–5 purposes, the insider's disclosure is improper only where it would violate his *Cady, Roberts* duty. Thus, a tippee assumes a fiduciary duty to the shareholders of a corporation not to trade on material nonpublic information only when the insider has breached his fiduciary duty to the shareholders by disclosing the information to the tippee and the tippee knows or should know that there has been a breach. As Commissioner Smith perceptively observed in *Investors Management Co.*: '[T]ippee responsibility must be related back to insider responsibility by a necessary finding that the tippee knew the information was given to him in breach of a duty by a person having a special relationship to the issuer not to disclose the information .... '44 S.E.C., at 651 (concurring in the result). Tipping thus properly is viewed only as a means of indirectly violating

the *Cady, Roberts* disclose-or-abstain rule.

*Dirks v. S.E.C.*, 103 S.Ct. at 3264. (Emphasis in original, footnotes omitted.)

7. Thus, only when a disclosure is made for an "improper purpose" will such a "tip" constitute a breach of an insider's duty, and only when there has been a breach of an insider's duty which the "tipee" knew or should have known constituted such a breach will there be "tippee" liability sufficient to constitute a violation of § 10(b) and Commission Rule 10b–5.

8. In *Dirks*, the court held that a disclosure is made for an "improper purpose" when an insider personally will benefit, directly or indirectly, from his disclosure. That court stated: "Absent some personal gain, there has been no breach of duty to stockholders. And absent a breach by the insider [to his stockholders], there is no derivative breach [by the tippee]. *Dirks*, 103 S.Ct. at 3265.

9. G. Platt did not breach a fiduciary duty to stockholders of Phoenix for purposes of Rule 10b–5 liability nor § 10(b) liability, when he disclosed to his wife at the track meet of June 6, 1981, that there was going to be a possible liquidation of Phoenix.

10. This information was given to Mrs. Platt by G. Platt for the purpose of informing her of his up-coming business schedule so that arrangements for child care could be made.

11. The information was inadvertently overheard by Switzer at the track meet.

12. Rule 10b–5 does not bar trading on the basis of information inadvertently revealed by an insider.

13. The information was not intentionally imparted to Switzer by G. Platt, nor was the disclosure made for an improper purpose.

14. G. Platt did not personally benefit, directly or indirectly, monetarily or otherwise from the inadvertent disclosure.

15. As noted above, *Dirks* set forth a two-prong test for purposes of determining whether a tippee has acquired a fiduciary duty. First, it must be shown that an insider breached a fiduciary duty to the shareholders by disclosing inside information; and, second, it must be shown that the tippee knew or should have known that there had been a breach by the insider. *Dirks*, 103 S.Ct. at 3264.

16. G. Platt did not breach a duty to the shareholders of Phoenix, and thus plaintiff failed to meet its burden of proof as to the first prong established in *Dirks*. Since G. Platt did not breach a fiduciary duty to Phoenix shareholders, Switzer did not acquire nor assume a fiduciary duty to Phoenix's shareholders, and because Switzer did not acquire a fiduciary duty to Phoenix shareholders, any information he passed on to defendants Smith, Hodges, Amyx, Hoover, Kennedy and Deem was not in violation of Rule 10b–5.

17. Since plaintiff did not meet its burden of proof as to the first prong of the two-prong *Dirks* test, *i.e.*, it was not proved that G. Platt breached a fiduciary duty to the shareholders of Phoenix, tippee liability cannot result from G. Platt's inadvertent disclosure to Switzer.

18. Even if, however, plaintiff had met the first prong of the two-part test, *i.e.*, had proven that G. Platt did disclose material non-public information to Switzer at the track meet in an improper manner, the court would still find no resulting tippee liability to Switzer, Smith, Hodges, Amyx, Hoover, Kennedy and Deem because the court concludes plaintiff failed to prove the second prong of the *Dirks* test as well. These defendants did not know, nor did they have reason to know, that the information they received was material, non-public information disseminated by a corporate insider for an improper purpose, and, thus, under *Dirks*, are not liable as tippees under Rule 10b–5.

19. Defendants Switzer, Smith, Hodges, Amyx, Hoover, Kennedy and Deem have not been shown to have a propensity to engage in additional violations of Rule 10b–5 in the future. Hence, a perma-

nent injunction may not be entered against these defendants.

20. The SEC is not entitled to disgorgement of profits calculated on a pre-income tax basis in connection with transactions which occurred during previous tax years.

The foregoing shall constitute the findings of fact and conclusions of law of this court. Any findings of fact which may be construed as conclusions of law shall so be construed; in like manner, any conclusions of law which may be construed as findings of fact shall so be construed.

On the basis of the above findings of fact and conclusions of law, the court orders judgment in favor of defendants.

The court now turns to the motion for attorneys' fees pursuant to the Equal Access to Justice Act [hereinafter EAJA], 28 U.S.C. 2412 (1980). Defendants Switzer, Smith, Hoover, Kennedy and Hart have petitioned this court for an award of attorneys' fees and costs authorized pursuant to the EAJA. Defendants Hodges and Amyx have petitioned the court for a similar award, but have brought the petition on behalf of their investment partnership.

■ Section 2412(d)(1)(A) of the Act provides that a court "shall" award an eligible[1] private prevailing party attorneys' fees and other litigation expenses unless some other statute specifically provides otherwise,[2] or "the court finds that the position of the United States was substan-

tially justified or that special circumstances make an award unjust."[3]

■ The EAJA permits the government, when it loses a case, to avoid liability for attorneys' fees if it can demonstrate that its litigation position was "substantially justified." See *Spencer v. NLRB*, 712 F.2d 539 (D.C.Cir.1983); *United States v. 2,116 Boxes of Boned Beef*, 726 F.2d 1481 (10th Cir.1984). The government bears the burden of demonstrating that its position was "substantially justified." *Spencer, supra*, 712 F.2d at 557; *S & H Riggers & Erectors, Inc. v. OSHRC*, 672 F.2d 426 (5th Cir.1982).

To meet the substantial justification standard, the government need only demonstrate its litigation position was reasonable. In *2,116 Boxes, supra*, the court held that the government need not establish its decision to litigate was based on a substantial probability of prevailing, but only need "show that there is a reasonable basis in truth for the facts alleged in the pleadings; that there exists a reasonable basis in law for the theory it propounds; and that the facts alleged will reasonably support the legal theory advanced." 726 F.2d at 1487. See also *Dougherty v. Lehman*, 711 F.2d 555 (3rd Cir.1983).

■ The court believes plaintiff's theory or position taken at litigation had a reasonable basis in law. Plaintiff asserted that violations under 10b–5 resulted when inside information was made available or "tipped"

---

**1.** The government claims Hodges and Amyx have not demonstrated their financial eligibility because they have brought their application on behalf of their investment partnership and not as individual defendants. Since the court finds that plaintiff's position was substantially justified, it is unnecessary to address the financial eligibility issue raised by the government as to defendants Hodges and Amyx.

**2.** The EAJA provides that costs may be awarded "except as otherwise specifically provided by statute." 28 U.S.C. 2412(a). Section 27 of the Securities Exchange Act of 1934 specifically precludes any award of costs against the Commission. Section 27 states: "No costs shall be assessed for or against the Commission in any proceeding under this title brought by or against it ...."

Accordingly, the court concludes that any request contained in these motions for costs must be denied because such award is specifically prohibited by Section 27 of the Securities Exchange Act of 1934.

**3.** In relevant part, 28 U.S.C. 2412(d)(1)(A) provides:

[A] court shall award to a prevailing party other than the United States fees and other expenses ... incurred by that party in any civil action (other than cases sounding in tort) brought by or against the United States in any court having jurisdiction of that action, unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust.

to outsiders who then traded on the improperly obtained inside information when the tip was made by an insider in breach of his fiduciary duty to the corporate shareholders, and the "tippee knew or should have known of the breach." *Dirks,* 103 S.Ct. 3264 (1983).

The court further finds plaintiff's litigation position had a reasonable basis in fact. At trial, the SEC proceeded to set forth its case, based on circumstantial evidence, that the material, non-public information regarding the possible liquidation of Phoenix made available to Switzer on June 6, 1981, at a track meet in Norman, Oklahoma, had been passed to him in an improper manner by G. Platt, an insider at Phoenix. Although Switzer claimed he had overheard the information, and neither G. Platt nor his wife, Linda, recalled discussing Phoenix at the track meet that day, the SEC presented strong circumstantial evidence in support of its theory.

Although the court found the testimony of G. Platt and Switzer to be more credible and probative than the circumstantial evidence presented by the government, the court does not find that the circumstantial evidence was so devoid of legal or factual support that a fee award would be appropriate. Simply because G. Platt and Switzer did not admit they had engaged in an improper exchange of inside information does not mean the SEC could have no reasonable basis in fact for believing there had been improper conduct and bringing an action so that a determination of that issue could be made.

In view of the considerable circumstantial evidence presented by the SEC that the tip was intentional and not merely inadvertent, as claimed by defendants, the court finds the SEC's position to have been substantially justified, and on that basis the court denies the application of defendants Switzer, Smith, Hoover, Deem and Kennedy, as well as Hodges and Amyx,[4] for

attorneys' fees pursuant to 28 U.S.C. 2412(d)(1)(A).

Defendant Hart has also filed an application for an award of attorneys' fees under the EAJA. Hart was dismissed from the case on a motion for summary judgment. Although he was dismissed at the summary judgment stage, the court finds the SEC's position in naming him in the lawsuit was substantially justified and had a reasonable basis in both law and fact, and therefore, the court denies defendant Hart's application for attorneys' fees under the EAJA as well.

JAMES HART'S MOTION FOR ENTRY OF JUDGMENT

Defendant Hart was granted summary judgment in an opinion and order filed on May 20, 1983. He has now moved the court for entry of judgment and further requests that the date of entry of judgment be the same as the date judgment is entered for the defendants who participated in the trial to the court. Defendant Hart's motion for entry of judgment is hereby granted. Further, the date of entry of judgment shall be the same as the date judgment is entered for defendants Switzer, Smith, Hoover, Amyx, Hodges, Kennedy and Deem.

IT IS BY THE COURT THEREFORE ORDERED, based on the earlier stated findings of fact and conclusions of law, that judgment is hereby entered in favor of defendants regarding the court trial which commenced March 19, 1984, and concluded March 22, 1984.

IT IS FURTHER ORDERED that the motions of defendants Switzer, Smith, Hoover and Hart for award of attorneys' fees and expenses are hereby denied.

IT IS FURTHER ORDERED that the motion for attorneys' fees brought on behalf of the Hodges, Amyx, Cross and Hodges partnership is hereby denied.

IT IS FURTHER ORDERED that the motion for attorneys' fees brought on be-

---

**4.** Again, the court denies the application of defendants' Hodges and Amyx, brought by them through their investment partnership, for attor-

neys fees on the sole basis that the government's litigation position was substantially justified.

half of defendant Kennedy is hereby denied.

IT IS FURTHER ORDERED that defendant James Hart's motion for entry of judgment is hereby granted in accordance with the Memorandum and Order of May 20, 1983. IT IS FURTHER ORDERED that the date of entry of judgment shall be the same as the date judgment is entered for defendants Switzer, Smith, Hoover, Amyx, Hodges, Kennedy and Deem.