**Andrew W. McGHEE, Plaintiff,**

v.

**Richard L. JOUTRAS, individually and as trustee for the Richard L. Joutras Trust; Richard L. Joutras Trust;[1] Gary R. Dorn, individually and as trustee for the Gary R. Dorn Trust; and the Gary R. Dorn Trust, Defendants.**

No. 94 C 7052.

United States District Court,
N.D. Illinois,
Eastern Division.

Dec. 15, 1995.

---

1. Those two first-named defendants have settled, and this Court has made a Fed.R.Civ.P. ("Rule") 54(b) determination, so that a final judgment order has been entered as to those defendants on December 8, 1995.

Joel J. Africk and Douglas A. Graham of Jenner & Block, Chicago, IL, for Plaintiff.

Thomas P. Ward and Joseph S. Wright of McBride, Baker & Coles, Chicago, IL, for Defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

Andrew McGhee ("McGhee") has sued Gary Dorn individually and as trustee of the Gary R. Dorn Trust (for convenience both of those defendants will be referred to as "Dorn," treated as a singular noun), alleging that Dorn violated the Securities Exchange Act of 1934 ("1934 Act")[2] § 10(b)[3] and the SEC's implementation of that section through its Rule 10b–5, 17 C.F.R. § 240.10b–5, when he purchased 35,000 shares of FNW Bancorp, Inc. ("FNW") stock from McGhee. Dorn now moves for summary judgment under Fed.R.Civ.P. ("Rule") 56, both sides have complied with this District Court's General Rule ("GR") 12(M) and 12(N) and the motion is fully briefed and ready for decision. For the reasons stated in this memorandum opinion and order, Dorn's motion is denied.

### Summary Judgment Standards

Familiar Rule 56 principles impose on movant Dorn the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). For that purpose this Court is "not required to draw every conceivable inference from the record—only those inferences that are reasonable"—in the light most favorable to nonmovant McGhee (*Bank Leumi Le–Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir.1991) and cases cited there). In those terms summary judgment is appropriate if the record reveals that no reasonable jury could con-

clude that Dorn violated 1934 Act § 10(b) and Rule 10b–5.

Mention should be made at this stage, however, of a mischaracterization of the parties' roles that has been advanced by McGhee's counsel. McGhee Mem. 24 improperly seeks to place the burden of proof as to Dorn's summary judgment motion on Dorn, asserting that Dorn must establish each of several propositions as a matter of law. Two points should be made in that respect:

1. As to Dorn's claimed possession of any material nonpublic information about FNW's merger discussions at the time when McGhee sold his stock to Dorn, that level of scienter on Dorn's part is of course an essential element of McGhee's cause of action. Hence the burden of proof on that issue rests on McGhee, rather than the burden of disproof being on Dorn (although in the summary judgment context, of course, McGhee's burden is the somewhat lesser one of demonstrating that a rational factfinder could conclude that McGhee had met that burden). But as to McGhee's further contention that Dorn "should have known" of the existence of such nonpublic information, see n. 5 and the later discussion in this opinion to which it refers.

2. As to the issue of McGhee's damages, McGhee Mem. 37 n. 22 seeks to exclude certain admissible evidence tendered by Dorn that seeks to undercut McGhee's case by showing that McGhee has already recovered all of his potential damages. This too will be discussed at greater length later.

As with every summary judgment motion, this Court accepts nonmovant McGhee's version of any disputed facts.[4] What follows,

---

**2.** This opinion employs the common usage of referring to the 1934 Act by its internal numbering, rather than by its lettering within 15 U.S.C. § 78a.

**3.** To be accurate, McGhee bases his claim on 1934 Act § 20A, a 1988–enacted provision that grants standing to a private seller or purchaser of securities to recover against a purchaser or seller "who violates any provision of this chapter

or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information...."

**4.** This District Court has designed GR 12 to facilitate the resolution of Rule 56 motions by highlighting the existence or nonexistence of factual disputes. GR 12(M) requires a Rule 56 movant to submit a statement of assertedly uncontested facts, with citations to the record in

then, is a version of the facts culled from the parties' submissions, with any differences between them resolved in McGhee's favor.

## Facts[5]

### FNW Bancorp, Inc.

As early as 1988 President James Lancaster ("Lancaster") of NBD Illinois ("NBD–I"), a subsidiary of NBD Bancorp, Inc. ("NBD"), communicated with FNW—a Chicago area holding company that owned several banks—to express the interest of NBD (a much larger institution) in acquiring FNW (M. 12(N) Supp. ¶ 1; Lancaster Aff. ¶¶ 1–3). Although Lancaster and Wilber Smith ("Smith"), FNW's Chief Executive Officer at the time, met briefly on two occasions, nothing really came of those discussions because Smith expressed FNW's satisfaction with its existing course—seeking to grow both by expanding its internal operations and by acquiring smaller banks (M. 12(N) Supp. ¶¶ 1–2; Lancaster Aff. ¶¶ 2, 3).

Then in July 1989 Lancaster and NBD–I Chairman James Costakis ("Costakis") met with Smith and FNW board member/Chief Operating Officer Harold Pehlke ("Pehlke") to discuss the possibility of a merger between NBD and FNW (M. 12(N) Supp. ¶ 6; Lancaster Aff. ¶ 4; D.App. 127, 241). And during the August 1989 FNW board meeting Smith and Pehlke informed the board that NBD was interested in making an offer for FNW (M. Ex. H at 3–4). In the same meeting board member Joutras told the board that First Illinois Corp. ("First Illinois") was also expressing interest in a "merger of equals" with FNW (id. at 4). FNW's board responded by agreeing that FNW should pursue the alternative avenues by engaging in "discreet talks" with both NBD and First Illinois (id.).

Smith, Pehlke, Lancaster and Costakis met on August 31 and October 20, 1989 to discuss the possibility of a merger between FNW and NBD. Those meetings "went well enough and were serious enough" that FNW invited NBD to make a presentation to FNW's board at the November 15, 1989 FNW board meeting (Lancaster Aff. ¶¶ 5–6; D.App. 127). Instead of that meeting being held at FNW's usual meeting site, it was moved to an alternate location[6] to preserve the confidentiality of the session (M. 12(N) Supp. ¶ 11; Pehlke Dep. 129–30). NBD was represented at the meeting by Costakis, Lancaster and two high-ranking NBD officers—Vice Chairman Verne Istock ("Istock") and Chief Financial Officer Dean Kaylor (M. 12(N) Supp. ¶ 11; D.App. 127). General discussions were held about "how the organizations would fit together" and "how NBD would organize subsequent to the merger." But when asked to give a specific price at which NBD would be interested in acquiring FNW, NBD's people responded that they were not prepared to do so (Lancaster Aff. ¶¶ 7–8; M. 12(N) Supp. ¶ 12; D.App. 127).

support of those facts. Then GR 12(N) requires the nonmoving party to respond point by point, with citations to the record in support of (1) any claimed disputes as to the movant's version of the facts and (2) any additional facts that the nonmovant chooses to assert. Dorn's GR 12(M) statement will be cited "D. 12(M) ¶ —," while McGhee's 12(N) responses and statement of supplemental facts will be cited "M. 12(N) ¶ —" and "M. 12(N) Supp. ¶ —," respectively. Citations to Dorn's evidentiary Appendix will take the form "D. App.—," and McGhee's exhibits will be cited as "M. Ex.—."

5. Although this should become plain during the course of the factual presentation, it is worth mentioning up front that there is no direct evidence tying Dorn to any greater knowledge of the imminence of an FNW acquisition (or of any other material nonpublic information as to the value of FNW stock) than McGhee himself had at the time of the challenged transaction. Instead,

all of the evidence set out in the next section of the text relates to knowledge that was possessed by Richard Joutras ("Joutras"), the codefendant in this action with whom McGhee has now settled. In his effort to target Dorn, McGhee relies on inferences that Joutras had communicated such insider information to Dorn before the latter's purchase from McGhee—something that Dorn and Joutras swear never took place. McGhee also relies on authorities (discussed later) that impose liability on someone in Dorn's position if he "should have known" that he was trading on improperly obtained nonpublic information—but in that respect (as in others—e.g., the issues discussed in the preceding section of this opinion) McGhee's counsel indulges a subtle mischaracterization (also discussed later) of those authorities.

6. That location was the office of Bradley Printing ("Bradley"), a company co-owned by Dorn and Joutras.

Following the NBD presentation, the FNW board voted to "proceed to the next step in discussions with NBD Bancorp for the purpose of determining NBD Bancorp's monetary intentions," and a committee of the FNW board was empowered to continue discussions with NBD (D.App. 178; M. 12(N) Supp. ¶ 12).

FNW's committee met with NBD's Istock and Kaylor on November 30, 1989 to review "data pertinent to a potential merger" (M. Ex. I at 3; M. 12(N) Supp. ¶ 13). Although NBD again did not provide FNW with a specific price, its people gave FNW a "matrix of values" from which it would be possible to compute a rough estimate of the price at which NBD was willing to purchase FNW (Pehlke Dep. 137–38; M. 12(N) Supp. ¶¶ 13–15).

FNW's full board met on December 20, 1989, discussed the potential NBD merger and concluded that FNW was "not interested in a merger under these conditions" but was "willing to keep lines of communication open" (D.App. 184–85). One of the principal opponents of the merger on the FNW board was FNW director and Chief Financial Officer Charles Bruning III ("Bruning") (Schaps Dep. 25–26).[7] Without Bruning's support a merger would have been very difficult to complete, because the Bruning family owned roughly 25% of FNW's stock (M. 12(N) Supp. ¶ 19). One problem that Bruning had with the merger was that his family was in the process of settling his grandfather's estate and was establishing a value for the estate's 2,219,316 shares of FNW stock. Because FNW was a closely held corporation in a thinly traded market, the estate's FNW stock was potentially eligible for a "blockage discount" for estate tax purposes. But if a merger were in the works, such a discount would be more difficult to get because the value of the stock would be much easier to ascertain (M. 12(N) Supp. ¶¶ 18–20).

It was NBD's impression that the Bruning estate situation "appeared to be getting in the way of a merger" and was one reason why the merger discussions had come to a standstill (Lancaster Aff. ¶ 9). So NBD let several months pass without pursuing the matter. It took no action until March 28, 1990, when NBD's Lancaster and Istock met with Bruning "to determine if we were right about whether the estate settlement was a cause for the delay and to find out how much time needed to pass before that was no longer a problem" (Lancaster Aff. ¶ 9; M. 12(N) Supp. ¶ 21). That meeting confirmed for NBD "that time was going to have to pass before any merger could be done" (Lancaster Aff. ¶ 9; M. 12(N) Supp. ¶ 21).

In April 1990 Istock and Lancaster invited Bruning to visit NBD's headquarters in Detroit and, with the encouragement of FNW's board, Bruning accepted the invitation (D.App. 193). On May, 2 1990 Bruning went to Detroit, met with NBD's Chairman and President Charles T. Fisher III and toured NBD's facilities (D.App. 196–97). Although Bruning was "very impressed with everything" at NBD, he told NBD that he would "just as soon wait until my grandfather's estate is a little bit more settled until we proceed with anything more concrete than what we are doing right now" (Bruning Dep. 42; M. 12(N) Supp. ¶ 37). Bruning stressed to both the FNW board and NBD that his meeting with NBD was done in his capacity "as a shareholder, not as an officer or director of FNW" (D.App. 197; Bruning Dep. 42).

On July 14, 1990 Joutras—who had become FNW's Chairman [8]—met with First Illinois' largest shareholder Daniel Terra to discuss the possibility of a merger of equals between FNW and First Illinois (M. 12(N) Supp. ¶ 38). That discussion led to an August 10, 1990 meeting between Joutras and First Illinois' president (*id.*).

In August 1990 Chicago Corp., an investment banking corporation, suggested to the FNW board that FNW actively pursue an

---

7. Herbert Bruning—FNW's controlling shareholder—had died in April 1989, and voting control over his stock was transferred to his grandson Bruning (M. 12(N) Supp. ¶ 5). Bruning's father, Charles Bruning II, was also a member of the FNW board (Schaps Dep. 26).

8. Joutras was elected to serve as FNW's board Chairman effective in April 1990 (M. 12(N) Supp. ¶ 16).

acquisition or merger (M. Ex. K at 3). And in September 1990 FNW's board voted to engage Chicago Corp. to assist it with any acquisitions or mergers (*id.*).

Additional meetings about the possibility of an FNW/First Illinois merger took place in October 1990, with further talks scheduled for November 1990 (M. 12(N) Supp. ¶ 46). At the same time FNW was involved in discussions with another banking company, Northern Illinois Financial Corp. ("Northern Illinois"), about a possible merger (M. 12(N) Supp. ¶ 47).

All was quiet on the NBD/FNW front until October 21, 1990, when Joutras had a chance encounter with Lancaster at the American Bankers' Association ("ABA") convention in Orlando, Florida (Lancaster Aff. ¶ 10; D.App. 128). Joutras told Lancaster that "things are different" at FNW and that he would like to resume talks between NBD and FNW (Lancaster Aff. ¶ 10). Two days later Lancaster and Joutras met again in Orlando at an ABA reception and discussed how they "could move a merger of FNW and NBD along" (*id.*). Although no specifics such as price were discussed, Lancaster felt more optimistic about a possible deal (*id.* ¶¶ 12–13):

> My conversation with Mr. Joutras confirmed my belief that the settlement of affairs following the senior Bruning's death had held up merger discussions. As a result of our conversation, I understood that sufficient time had passed and that FNW could now talk about a merger. After my talk with Mr. Joutras, I felt good about the prospects of a merger with FNW. I felt that Mr. Joutras and I had breathed life back into the process. I felt that the door was open again.
>
> I made it clear to Mr. Joutras in Orlando that NBD was still interested in a deal. . . . Mr. Joutras told me that he thought he had enough influence that if we could structure the merger properly that he could sell the deal to his board and get enough votes to get it approved.

On November 2, 1990 Lancaster and Joutras met for lunch in a Chicago area restaurant and "talked about all the aspects of trying to do a deal, and what kind of process

we would have to go through, and how quickly we could move it along, what concerns FNW had, and all· of that" (Lancaster Aff. ¶ 15). Joutras indicated that he was lining up support for the merger and gave Lancaster the impression that he had been in contact with other FNW directors since their meeting in Orlando (*id.* ¶ 16), although he had not yet "involved" FNW President Pehlke (*id.* ¶ 15).

Then at the November 14, 1990 FNW board meeting Joutras reported to the board that "NBD Bancorp executives would like to again lunch with us" (D.App. 213). Minutes of that meeting reflect that FNW was pursuing several other possible merger and acquisition options at that time, including continuing talks with First Illinois and Northern Illinois (*id.*).

Between November 2 and December 4, 1990 Joutras and Lancaster had several brief telephone conversations in which Joutras said that he was lining up additional support for the merger and asked Lancaster questions about the organizational structure of a merged NBD/FNW (Lancaster Aff. ¶ 19). According to Lancaster (*id.* ¶ 20):

> During the November–December 1990 period, the only apparent sticking point was price, and that was unknown. During that time period, everybody assumed that there were no serious obstacles, other than price. In any negotiation, and this was no different, there are all kinds of "second level issues" that have to be resolved. At that point, I think everybody believed that if we came to an agreement on price, that none of the second level issues would end up being first level issues.

On December 20, 1990 FNW's board invited NBD to make a presentation at the February 21, 1991 board meeting (M. 12(N) Supp. ¶ 59). In the meantime there were at least three meetings between NBD and FNW representatives, none of which included any mention of price or an exchange ratio (D. 12(M) ¶ 49). NBD's presentation at the February 21 meeting was well received by FNW and led to a series of additional meetings. On March 19 they agreed to an exchange rate for NBD to acquire FNW: Each

FNW share would be exchanged for .384 NBD shares (M. 12(N) Supp. ¶¶ 61–62; D.App. 130). FNW's board met twice to consider the exchange ratio, approved it, and on March 25, 1991 FNW and NBD issued a press release announcing the merger (D. 12(M) ¶¶ 51–55; M. 12(N) Supp. ¶ 65).

*McGhee, Joutras and Dorn*

Joutras and Dorn had known each other since 1958 and were the co-owners of Bradley, a printing business that Joutras and Dorn had started together over 25 years ago and that had grown into an $80–million–dollar–a–year business (M. Ex. N; M. 12(N) Supp. ¶ 33). In addition to Bradley, Joutras and Dorn invested together in several other partnerships and closely held corporations, used the same tax consultant, brokers and lawyers, maintained their trusts at the same bank and spoke to each other daily (M. 12(N) Supp. ¶¶ 33–34). Before January 1, 1990 both Joutras and Dorn owned FNW stock—Joutras had 100,000 shares and Dorn 80,940 shares (M. 12(N) Supp. ¶ 23).

McGhee, together with Joutras and Dorn, was on the board of directors of the First National Bank of Mount Prospect, a Chicago area wholly-owned subsidiary of FNW (D. 12(M) ¶¶ 4–6). It has already been mentioned that Joutras was also a board member and then Chairman of FNW, but neither Dorn nor McGhee held any position with FNW (D. 12(M) ¶¶ 4–5). McGhee was however an investor in FNW, owning 152,556 shares of its stock by September 1990 (D. 12(M) ¶ 15).

In early November 1990 McGhee called Pehlke, told him that he was looking to sell 70,000 shares of his FNW stock to pay down an outstanding bank loan, and asked if Pehlke knew of any potential buyers (D. 12(M) ¶ 23). Pehlke suggested that McGhee call Joutras (D. 12(M) ¶ 24). Within a few days McGhee did so and offered to sell Joutras 70,000 FNW shares (D. 12(M) ¶ 25; D.App. 85). Joutras responded that he would get back to McGhee (*id.* 85–86).

Several days later Joutras called and told McGhee that he and Dorn were interested in splitting the purchase (D. 12(M) ¶ 26). And on November 13, 1990 it was agreed that McGhee would sell each of Joutras and Dorn

35,000 shares for $8.50 per share, with the transfer to take place on November 15 (D. 12(M) ¶ 27). On November 15 the share transfer documents were executed, and in the following week McGhee received payment from Joutras and Dorn (D. 12(M) ¶ 28–29). At no time did Joutras disclose to McGhee any information about (1) his discussions with Lancaster, (2) the prior contacts between NBD and FNW or (3) any other information known to Joutras about discussions within the FNW board regarding potential mergers—nor is there any evidence that such information was public or that McGhee had otherwise acquired knowledge of it.

*1934 Act § 10(b) and Rule 10b–5*

█ There is hardly a need to quote the familiar language of 1934 Act § 10(b) or of the SEC's implementing Rule 10b–5. It is enough to say for purposes of this opinion that those provisions preclude a tippee of a corporate insider, as well as the insider himself or herself, from buying or selling securities while in possession of material, nonpublic information unless that information is first disclosed (*SEC v. Cherif,* 933 F.2d 403, 408–09 (7th Cir.1991). As explained in *Cherif, id.* at 409 (citations to *Chiarella v. United States,* 445 U.S. 222, 230, 100 S.Ct. 1108, 1115, 63 L.Ed.2d 348 (1980) and *Dirks v. SEC,* 463 U.S. 646, 660, 103 S.Ct. 3255, 3265, 77 L.Ed.2d 911 (1983) omitted):

> The theory is that an insider owes a fiduciary duty to the corporation's shareholders not to trade on inside information for his personal benefit. A tippee of an insider owes a fiduciary duty which is derivative of the duty owed by the insider.

Because Dorn was unquestionably not an FNW insider, McGhee's claim against Dorn hinges on whether Dorn can be held liable as Joutras' tippee. Dorn's motion and accompanying memoranda deny Rule 10b–5 liability for two main reasons:

1. Any nonpublic information that Joutras possessed was not material.

2. Even if Joutras' information was material, Dorn cannot be held liable because he was not in possession of that informa-

tion when he purchased the stock from McGhee—in other words he was not Joutras' tippee.

*Materiality*

■ Rule 10b–5 prohibits only "trading on the basis of *material* nonpublic information that is not disclosed before trading" (*SEC v. Maio,* 51 F.3d 623, 637 (7th Cir.1995)). *Basic Inc. v. Levinson,* 485 U.S. 224, 231–32, 108 S.Ct. 978, 983–84, 99 L.Ed.2d 194 (1988) expressly adopted for those purposes the standard articulated by *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976):

> [T]here must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.

■ Before *Basic* several courts had adopted a bright-line rule that unless merger discussions had ripened into an agreement in principle as to price and structure, such discussions would be immaterial as a matter of law. But *Basic,* 485 U.S. at 238, 108 S.Ct. at 987, quoting *SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 849 (2d Cir.1968) (en banc) teaches that the materiality of information as to contingent or speculative events "will depend at any given time upon the balancing of both the indicated probability that the event will occur and the anticipated. magnitude of the event in light of the totality of the company activity." *Basic, id.* went on to quote *SEC v. Geon Indus., Inc.,* 531 F.2d 39, 47–48 (2d Cir.1976) to the effect that, a merger is the "most important event in a small corporation's life" and "that inside information, as regards a merger of this sort, can become material at an earlier stage than would be the case as regards lesser transactions." Hence *Basic* rejected the "agreement in principle" approach (*id.* at 236, 108 S.Ct. at 986):

> We therefore find no valid justification for artificially excluding from the definition of materiality information concerning merger discussions, which would otherwise be con-

sidered significant to the trading decision of a reasonable investor, merely because agreement-in-principle as to price and structure has not yet been reached by the parties or their representatives.

That reasonable investor standard involves a case-by-case fact-specific inquiry that "requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact" (*TSC Indus.,* 426 U.S. at 450, 96 S.Ct. at 2133). To guide the factfinder, *Basic,* 485 U.S. at 239, 108 S.Ct. at 987 suggested looking to "indicia of interest in the transaction at the highest corporate levels," including by way of example "board resolutions, instructions to investment bankers, and actual negotiations between principals or their intermediaries. . . ." But of course the focus is always on whether, balancing the probability of the merger's consummation against its anticipated magnitude, there exists a substantial likelihood that a reasonable investor would have viewed the existence of the information as significantly altering the "total mix" of information available.

■ Dorn attempts to shift attention from that basic[9] inquiry somewhat. Thus he makes much of the reasons why McGhee wanted to sell the stock, particularly the fact that McGhee may have been in financial trouble in 1990 (D. 12(M) ¶¶ 7–17) and was therefore possessed by an "unrelenting determination to sell his FNW shares" (D.R. Mem. 7). If it were indeed true that McGhee would have sold his shares at that time in all events (whether because of "necessity's sharp pinch"[10] or otherwise), he would fail on the essential causation element of his claim that must accompany his showing of materiality (see, e.g., *Michaels v. Michaels,* 767 F.2d 1185, 1200 (7th Cir.1985); *Astor Chauffeured Limousine Co. v. Runnfeldt Inv. Corp.,* 910 F.2d 1540, 1546 (7th Cir.1990)).

Yet McGhee Mem. 18 n. 6 responds in part by incorrectly labeling that topic as irrele-

---

**9.** Bad pun intended.

**10.** William Shakespeare, *King Lear* act 2, sc. 4, line 214.

vant and by stating (inaccurately, in light of authorities such as those just cited):

> First, insider trading is prohibited in all contexts, regardless of the wealth or other investment activities of the victim.

As his second response, McGhee goes on (*id.*) to refer to his then-existing liquid portfolio of stocks and bonds (M. 12(N) Supp. ¶ 57). Although that bobtailed response to Dorn's detailed factual presentation (at his Mem. 6–9 and R. Mem. 7) is pretty thin, it appears to be enough to stave off summary judgment in favor of having the factfinder resolve the causation issue as part of "reliance" in the securities sense (*Astor Chauffeured Limousine*, 910 F.2d at 1546; *Basic*, 485 U.S. at 243, 108 S.Ct. at 989).

Dorn also emphasizes McGhee's testimony that he knew in 1990 that there was widespread merger activity in the banking industry and that large banks were looking to acquire smaller banks such as FNW; that FNW was an attractive property and, along with many other banks of its size, FNW could be considered "in play" as a potential merger candidate; that it was FNW's strategy to get its asset level above $1 billion so that it would be an attractive merger candidate; and that he was aware that FNW had reached that level by 1990 (D. 12(M) ¶¶ 18–22). But what is being measured here is the materiality of what McGhee did *not* know, so that the level of McGhee's actual knowledge is relevant only if it was sufficient to render nonmaterial what he did not know about Joutras' discussions with Lancaster, about the prior contacts between NBD and FNW and about discussions within the FNW board as to potential mergers (see, e.g., *Rowe v. Maremont Corp.*, 850 F.2d 1226, 1233 (7th Cir.1988)).[11]

This opinion returns then to the *Basic* balancing test. It really goes without saying that from FNW's standpoint the actual merger was an event of substantial magnitude. Thus the materiality of merger-related information as of November 13, 1990—the day that McGhee agreed to sell his FNW shares to Joutras and Dorn—really turns on the likelihood that the then-potential merger would come to fruition.

Dorn focuses on the fact that shortly before that date the only merger discussions that had taken place between NBD and FNW were between Joutras and Lancaster and consisted of two conversations in Orlando, a luncheon meeting back in the Chicago area and a few phone calls. Were those the only relevant facts this would be an easy case, but those discussions between Joutras and Lancaster did not take place in a vacuum.

Instead the recital of facts earlier in this opinion discloses a substantial history of discussions and actual negotiations between NBD and FNW, with those having been brought to a halt in December 1989 because of Bruning's concern as to the evaluation of the stock in his grandfather's estate. That caused NBD to view the turndown as perhaps a matter of timing alone, so that NBD waited a few months and then (in April 1990) invited Bruning to Detroit to meet with its officials and tour its facilities. Again the estate concerns proved to be a hurdle, and the matter was dropped until the chance meeting between Joutras and Lancaster some months later.

When viewed in that context, the later Joutras–Lancaster discussions could be seen by a reasonable jury as the reignition and continuation of a series of merger negotiations that took place at the "highest corporate levels"[12]—and by that time the hurdle of the Bruning estate concerns might reason-

---

11. What has just been stated in the text necessarily presumes that knowledge of the various items of nonpublic information was attributable to Dorn. Were that not the case, the level of McGhee's knowledge would be relevant because it would have placed him on a parity with Dorn, and hence would have rendered him unable to recover from Dorn on the basis of the latter's asserted possession of material nonpublic information (cf., e.g., *In re Mayer*, 51 F.3d 670, 676 (7th Cir.1995)).

12. Dorn stresses the "fact" (placed in quotes because McGhee disputes the contention) that neither Joutras nor Lancaster had authority to negotiate a merger. Though the renewed meetings between those two were fortuitous in their inception, again any inferences from the sequence of events would appear to be matters for a jury to draw or to reject.

**574**

ably be viewed as out of the way.[13] In the same general time frame (in early November 1990) Chairman Joutras was "lining up support" with other FNW directors. Thus the reasonable factfinder could view the discussions between Joutras and Lancaster, in light of NBD and FNW's history, as enough to indicate to a reasonable investor that the possibility of a successful NBD/FNW merger was sufficiently substantial to be considered material (see *Jordan v. Duff & Phelps, Inc.*, 815 F.2d 429, 432–34 (7th Cir.1987); *SEC v. Shapiro*, 494 F.2d 1301, 1303–07 (2d Cir. 1974)). Significantly, Lancaster and Joutras themselves saw the prospects of an NBD/FNW merger as promising at that time.

Courts do not usually hold that pre-merger discussions are immaterial as a matter of law unless they are so clearly preliminary and speculative that no reasonable investor could find them significant (as was found in such cases as *Taylor v. First Union Corp.*, 857 F.2d 240, 244 (4th Cir.1988) and *Jackvony v. RIHT Fin. Corp.*, 873 F.2d 411, 413–15 (1st Cir.1989)). Contrast such cases as *Pippenger v. McQuik's Oilube, Inc.*, 854 F.Supp. 1411, 1417–19 (S.D.Ind.1994) and *Johnston v. Wilbourn*, 760 F.Supp. 578, 585 (S.D.Miss. 1991)).

This should not be misunderstood as a finding of materiality, but rather a determination that the information cannot be held immaterial as a matter of law. In the summary judgment context it is not for this Court to evaluate the probability as of November 13, 1990 that the merger would actually be consummated, except to say that such probability was not so low that no rational jury could find that it would have been significant to a reasonable investor. In short, Dorn has failed to establish the lack of a genuine issue of material fact on the issue of materiality.

*Tippee Liability*

It should be emphasized that the entire just-concluded discussion of materiality has proceeded from the novelist's perspective of the omniscient observer, *not* from what Dorn himself concededly knew. That admitted knowledge was limited to the general climate in the banking industry, to the fact that FNW was considered an attractive merger candidate and to some greater level of information as to FNW in general than that possessed by an average investor. But that degree of knowledge was no more than McGhee had, so that it can scarcely be contended that in those respects Dorn was trading on information that the reasonable prospective seller in McGhee's position would have considered material. In the most simple terms, knowing that a company is a very attractive merger candidate is no substitute for knowing that a specific deal is in the works.

█ So the issue becomes one of communication: whether Joutras' knowledge (he was truly the omniscient observer) was imparted to Dorn before he bought McGhee's shares. In the traditional jargon of the securities case law, Dorn's potential Rule 10b–5 liability hinges on whether he was Joutras' tippee, so as to owe a derivative duty to disclose Joutras' information or to abstain from trading under *Dirks*, 463 U.S. at 660, 103 S.Ct. at 3265:

> Thus a tippee assumes a fiduciary duty to the shareholders of a corporation not to trade on material nonpublic information only when the insider has breached his fiduciary duty to the shareholders by disclosing the information to the tippee and the tippee knows or should know that there has been a breach.

McGhee Mem. 33 impermissibly attempts to conflate the two components of that ruling and of the adherence to that ruling in *Maio*, 51 F.3d at 632 in this fashion:

> A tippee is liable for insider trading if he "knows or should have known" that he was trading on improperly obtained information.

That statement and the argument that follows at McGhee Mem. 34 assert that it is

**13.** Relatedly, the climate at FNW was changing: Its board's general interest in a merger was heating up. In August 1990 an investment banking firm—Chicago Corp.—had suggested to the board that FNW actively pursue an acquisition or merger, and in the next month FNW's board had engaged Chicago Corp. to assist FNW with acquisitions or mergers. FNW had also held some discussions about potential mergers with several other institutions in October 1990.

sufficient if the buyer in Dorn's position "should have known" that some material non-public information existed when he acquired the purchased shares.[14]  Not so—inquiry notice in that more limited respect is not enough.  Instead the *Dirks* (and *Maio*) analysis has three parts:

1. Did Joutras actually disclose the information to Dorn?

2. If "yes," was that disclosure in breach of Joutras' fiduciary duty?

3. If both of those questions are answered "yes," did Dorn know or should he have known that Joutras' disclosure was improper?

Here the real difficulty lies in determining whether Joutras actually disclosed to Dorn the information about the FNW/NBD merger discussions (assuming arguendo that such information is found to have been material) before Dorn participated in the purchase of FNW stock from McGhee.  If McGhee can show that Dorn was in possession of the information, the second and third inquiries pose little problem, because a jury could easily find that Joutras improperly tipped Dorn to that information in breach of his fiduciary duty and that Dorn at least should have known that such was the case (see *Maio,* 51 F.3d at 632).

There is no direct proof that Joutras disclosed any information to Dorn—both Dorn and Joutras deny it.  Although McGhee cannot avoid summary judgment, as he contends, by creating a genuine factual issue as to whether a reasonable person "should have known" that information, he can dodge the bullet by demonstrating that a trier of fact could reasonably infer communication of the insider information from Joutras to Dorn.  In that respect the jury would learn that Joutras and Dorn were longtime friends and business partners who spoke daily and shared many common investments.  Those facts plus some degree of parallelism in their prior trading in FNW stock, when coupled with the fact that Joutras made available to

Dorn one-half of the 70,000 shares that McGhee wanted to sell—something that Joutras and Dorn necessarily had to have discussed—would appear to permit a rational factfinder to infer that part of their discussion dealt with Joutras' knowledge of the NBD situation.  Again this Court neither makes nor implies its own finding to that effect—it is enough to determine that a reasonable trier of fact could draw such an inference.

### Damages

One final matter needs to be resolved.  Dorn contends that even if he cannot now defeat McGhee's claim in substantive terms as a matter of law, Dorn must still prevail because McGhee has already pocketed more than the full amount that he is at best entitled to recover by reason of his sale of the 70,000 shares to Joutras and Dorn.  Dorn's basis for that contention rests on the fact that McGhee has already recovered $329,732.39 in addition to the $8.50 per share that he received when he initially sold the stock, resulting in a total payment of $13.21 per share if allocated to the entire 70,000 shares.  That additional recovery is the sum of (1) the amount that McGhee received from the settlement fund created by Joutras' settlement with the SEC (D. 12(M) ¶¶ 56–58)—$224,732.39—plus (2) the $105,000 that McGhee has received from his own settlement of this lawsuit with Joutras (Dorn R. Mem. 18).

After having staked out that additional figure, Dorn offers the unopposed testimony of an expert, David Ross ("Ross"), who employed a market-based analysis to conclude that much of the run-up in FNW stock prices that occurred between the date of sale and the date of the merger announcement is attributable to a market-wide increase in the value of banking stocks.  Ross also concluded that the closing price of FNW stock on the day after the merger announcement—$13.50—reflected a value that gave full effect to any previously-existing material nonpublic

**14.**  Lest there be any doubt as to McGhee's effort to sell this Court a bill of goods to that effect, here is the misleading caption of that section of McGhee's memorandum (Mem. 33, emphasis added):

The Extent of Dorn's (*or a Reasonable Person's*) Knowledge at the Time of the Purchase of McGhee's Stock is a Disputed Issue of Material Fact.

information as to the prospects of an FNW/NBD merger. Because McGhee does not oppose that evaluation with any evidence, but simply argues unpersuasively that Ross' analysis is inadmissible in evidence (and therefore may not be considered on the present Rule 56 motion), this Court accepts Ross' assessment as accurate on the current motion.

Implicit in Dorn's numbers are the premises (1) that Joutras' settlement with the SEC was based on a 70,000 share transaction (Dorn R. Mem. 19), which would mean that the settlement encompassed both Dorn's and Joutras' purchases from McGhee, as well as (2) that the proceeds of the recent McGhee–Joutras settlement should also be allocated to the entire 70,000 share purchase. Even apart from the latter allocation, on the first of those premises the SEC settlement alone would bring McGhee's realization on the 35,000 shares to $11.71 per share.

This time McGhee is saved almost despite himself. Although he *asserts* that the SEC settlement was attributable solely to the 35,000 shares bought by Joutras alone (McGhee Mem. 38), so that to this point McGhee would have received no added compensation for Dorn's purchase, his counsel has offered nothing but his ipse dixit to that effect. This Court was forced to conduct an independent investigation into the SEC's action against Joutras. Its review of that court file (*SEC v. Joutras*, Case No. 94 C 3339) has made it clear that Joutras' settlement with the SEC, and the consequent distribution of $224,732.39 to McGhee, was based only on Joutras' purchase of 35,000 shares from McGhee and did not encompass Dorn's purchase.[15]

At this stage of the proceedings, then, if McGhee turns out to have a viable claim he has not been fully compensated for the shares that he sold to Dorn. In that respect, no opinion is expressed here as to the includability or nonincludability of any part of the Joutras settlement proceeds in this case.

*Conclusion*

Dorn has failed to meet his burden of establishing the lack of a genuine issue of material fact. Accordingly his Rule 56 motion for summary judgment is denied.

---

**15.** Although McGhee recovered a total of $224,732.39 through the SEC, the case file reflects that $49,732.39 of that amount represented interest. Therefore the amount of disgorged profits recovered by McGhee was $175,000—$5 per share for the 35,000 shares. That matches the difference between the $8.50 price that Joutras paid for the shares and the $13.50 closing price of FNW stock on March 26, 1991 (the day after the merger announcement).